# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARSIAL LOPEZ, et al., | ) 1:07cv0474 DLB |
| | ) |
| | ) ORDER RE: PLAINTIFFS' |
| | ) MOTION FOR PARTIAL SUMMARY |
| Plaintiffs, | ) JUDGMENT AND/OR SUMMARY |
| | ) ADJUDICATION |
| | ) (Document 67) |
| | ) |
| v. | ) ORDER RE: DEFENDANTS' JOINT MOTION |
| | ) FOR SUMMARY ADJUDICATION |
| | ) (Document 36) |
| | ) |
| | ) ORDER RE: DEFENDANTS' JOINT MOTION |
| DONNY YOUNGBLOOD, et al., | ) FOR SUMMARY ADJUDICATION |
| | ) REGARDING COURT RETURNEES, |
| | ) QUALIFIED IMMUNITY AND ELEVENTH |
| | ) AMENDMENT IMMUNITY |
| Defendants. | ) (Document 63) |
| | ) |

On July 17, 2008, Defendants County of Kern, the Kern County Sheriff's Office ("KCSO"), Donny Younglood and Mack Wimbish ("Defendants") filed a joint motion for summary adjudication. On November 7, 2008, Defendants filed a second joint motion for summary adjudication regarding court returnees, qualified immunity and Eleventh Amendment immunity. On November 7, 2008, Plaintiffs Marsial Lopez, Sandra Chavez, and Theodore Medina filed their cross-motion for partial summary judgment and/or summary adjudication. All three motions were heard on December 19, 2008, before the Honorable Dennis L. Beck, United

States Magistrate Judge.[1]  Barrett Litt and Donald Cook appeared on behalf of Plaintiffs. Jennifer Thurston and Terence Cassidy appeared on behalf of Defendants.

## BACKGROUND

Plaintiff Marsial Lopez, individually and as class representative, filed the instant civil rights action on March 27, 2007.  On June 21, 2007, Plaintiffs Marsial Lopez, Sandra Chavez, and Theodore Medina, individually and as class representatives, filed a First Amended Complaint ("FAC") against Defendants.  Plaintiffs seek injunctive relief and damages resulting from the strip and/or visual body cavity searches of prisoners by the Kern County Sheriff's Department.

The FAC pursues causes of action for violation of the Fourth, Eighth and Fourteenth Amendments to the U.S. Constitution, violation of Article I, §§ 1, 7, 13 and 17 of the California Constitution and state law violations.  Plaintiffs allege that Defendants maintained a policy of indiscriminately strip/body cavity searching all or a large number of persons being processed into the jail without limitation on the number of persons who can see, hear or observe the searches. Plaintiffs also allege that Defendants improperly strip searched detainees who had been ordered released.

On July 17, 2008, Defendants filed a joint motion for summary adjudication regarding group strip searches.  Defendants contend that the group strip searches at issue do not violate the Fourth and Fourteenth Amendments.  In addition, Defendants argue that Plaintiffs' equal protection claim state law claims fail as a matter of law.

Pursuant to a briefing schedule, Plaintiffs filed an opposition to the motion on September 16, 2008, along with a statement of disputed and undisputed facts and objections to the declaration of Ian Silva.  On October 3, 2008, Defendants filed a reply and objections to the Declaration of Paul J. Estuar filed in support of Plaintiffs' motion.

On November 7, 2008, Defendants filed their second joint motion for summary adjudication regarding court returnees, qualified immunity and Eleventh Amendment immunity.

---

[1]Plaintiffs' motion to certify the class, Plaintiffs' motion to strike and Plaintiffs' motion to amend the FAC also are pending before the Court.

Defendants contend that (1) the searches of certain Plaintiffs who assert that their constitutional rights were violated when they were subjected to strip searches after returning to the jail following a court appearance in which they were ordered released were reasonable; (2) Defendants Yougblood and Wimbish are immune from liability because the law was not clearly established that searching post-arraignment detainees in small groups violates Plaintiffs' rights under the Fourth and Fourteenth Amendments and violates the Equal Protection Clause; (3) the Sheriff is a state actor and immune from a § 1983 suit; and (4) the County should be dismissed from this action.

Plaintiffs filed an opposition to Defendants' second motion on November 21, 2008, along with a statement of disputed and undisputed facts and the Declaration of Barrett S. Litt and Donald W. Cook. Defendants filed a reply and objections to Plaintiffs' statement of facts on December 5, 2008.

On November 7, 2008, Plaintiffs also filed their cross-motion for partial summary judgment and/or summary adjudication. Plaintiffs seek a determination that (1) KCSO's policy of strip searching persons ordered released from custody violated the Fourth Amendment; (2) KCSO's policy of group strip searching prisoners violated the Fourth Amendment; (3) the strip search policies violated Plaintiffs' state constitutional rights pursuant to Cal. Const. Art. I, § 1 (privacy), Cal. Const. Art. I, § 13 (unreasonable searches) and Cal. Const. Art. I, § 7 (equal protection); and (4) the entity defendants are liable under federal and state law.

Defendants filed an opposition to Plaintiffs' cross-motion for summary adjudication on November 21, 2008, along with a statement of undisputed facts and objections to the declaration of Donald W. Cook. Plaintiffs filed a reply on December 6, 2008.

## **FACTUAL BACKGROUND**

### A. **Jail Facilities**

Defendant KCSO operates four different jail facilities. These facilities include Central Receiving Facility ("CRF"), Ridgecrest, Mojave, and Lerdo. The main function of the CRF facility is booking and receiving arrestees coming straight off the street. Since at least 2003, pre-

arraignment misdemeanor arrestees at CRF were not subject to strip searches on a routine basis, either before or after their first court appearance.

If not released from CRF, arrestees are transported to the Kern County Superior Court ("Superior Court") for their initial court appearance. After their initial court appearance, arrestees are transported back to CRF for either (a) housing in the Lerdo jail if remanded to custody or (b) to be released from custody at CRF. Post-arraignment prisoners, including those serving sentences, are housed at Lerdo. Lerdo is divided into four different divisions: pretrial, maximum-medium ("max-med"), female minimum and male minimum.

**B.     KCSO Inmate Searches**

Procedure D of KCSO Policy C-500 specifies that persons in the general inmate population (not pre-arraignment detainees):

> may be subjected to a strip search or visual body cavity search in the following situations:
>
> •     After an inmate has left the facility and returned (i.e., medical appointment, court, etc.)
> •     After an inmate laborer has completed their assigned duties inside or outside the facility and is returning to their housing area.
> •     After any contact visit.
> •     If an officer has a reasonable suspicion that an inmate is concealing a weapon or contraband and that a strip search or visual body cavity search will result in discovery of the weapon or contraband.

KCSO, Detentions Bureau Policies and Procedures, Search Procedures C-500, p. 5; Exhibit E to the Declaration of Terrence Cassidy.

Per KCSO Search Procedure, a strip search involves a "visual inspection of the underclothing, female breasts, buttocks, or genitalia of such person." KCSO, Detentions Bureau Policies and Procedures, Search Procedures C-500, p. 2. A strip search includes a visual body cavity search. A visual body cavity search includes a "visual inspection of the anus and/or vaginal area; generally requiring the subject to bend over and spread the cheeks of the buttocks, to squat, and/or otherwise expose body cavity orifices." Id. From 2003 to present, the manner of strip searching prisoners has not changed.

From January 2005 to October 2007, the Kern County Sheriff's Department conducted a strip/visual body cavity ("strip/vbc") of all inmates who were moved from Lerdo to court and

back.  Upon arrival at Lerdo, prisoners were routinely subjected to a strip/visual body cavity search without regard to the reasonable suspicion standard.  This search policy included both prisoners housed for the first time at Lerdo following an initial court appearance and prisoners who were previously housed at Lerdo but who had been ordered released following a court appearance.

Prior to October 2007, all such strip/visual body cavity searches were group searches conducted in view of other inmates.  Each prisoner could observe the searches of other prisoners in the group.  There were no partitions or other barriers to prevent such observation.

In October 2007, Defendants stopped "group strip searches," adopting an updated policy.  KCSO, Detentions Bureau Policies and Procedures, Strip and Body Cavity Searches C-550, p. 2; Exhibit 1 to Declaration of Paul Estuar in Support of Plaintiffs' Opposition to Motion for Summary Adjudication.  Defendants now employ privacy partitions or booths when conducting strip searches at Lerdo facilities.

### C.    Individual Plaintiffs

#### 1.    Marsial Lopez

From about July 2005 to November 2006, Plaintiff Marsial Lopez was a prisoner in the Kern County Jail, awaiting trial and resolution of criminal charges filed against him.  Between July 2005 and November 2006, Plaintiff Lopez made numerous appearances in Superior Court regarding pending criminal charges.  After each appearance, he was returned to Lerdo.  Upon his arrival at Lerdo, Plaintiff Lopez was subjected to a strip/vbc search.  On November 6, 2006, Plaintiff Lopez appeared in Superior Court.  At that time, the court dismissed all charges against him and ordered his release.  Plaintiff Lopez returned to Lerdo and was subjected to a strip/vbc search.

#### 2.    Sandra Chavez

On February 17, 2007, KCSO deputies arrested Plaintiff Sandra Chavez.  She was housed at CRF where she was subjected to a strip/vbc search

///

///

### 3. Theodore Medina

On or about May 10, 2006, KCSO deputies arrested Plaintiff Theodore Medina. He was housed at Lerdo. On May 26, 2006, he appeared in Superior Court at which time the court sentenced him to time served. Plaintiff Medina returned to Lerdo and was subjected to a strip/vbc search.

### D. Court Returnees

Between January 2005 and October 2007, the Kern County Sheriff's Department subjected all inmates who were returning from court to a strip/vbc search . Inmates housed at the Lerdo facility of the Kern County Jail are required to be transported to one of the Kern County Superior Court locations to appear regarding the criminal charges against them. Hundreds of inmates are transported to court each day from the Lerdo facility. Sometimes at a court appearance, the court orders that the inmate should be released. Reasons for release may include release on the inmate's own recognizance, posting bail or complete dismissal of the criminal charges.

When the court issues an order of release, the clerk of the court enters the court's order into the local computerized Criminal Justice Information System ("CJIS"), as well as the reason for the order of release. After the clerk enters the information, CJIS creates a "flag" on the inmate's CJIS record. For jail staff to locate the flag, they must run a CJIS search to pull the records with the specific, court entered flag. Once jail staff runs the CJIS search for the inmates ordered released, each of these inmate records must be checked to determine whether there are other reasons for the inmate to remain in jail. Reasons for holding the inmates after a court-ordered release on a particular criminal case may include the existence of other ongoing criminal cases, holds or warrants. To conduct this check, the local CJIS system must be searched, along with the statewide California Law Enforcement Telecommunications System ("CLETS"). If it is determined that there is no other basis for the inmate to be retained in the jail, then the inmate is released.

///
///

**DISCUSSION**

A.    Summary Judgment Standard

Summary judgment is appropriate when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). "If the party moving for summary judgment meets its initial burden of identifying for the court the portions of the materials on file that it believes demonstrate the absence of any genuine issues of material fact," the burden of production shifts and "the non moving party must set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'" T.W. Electric Service, Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (quoting Fed.R.Civ.P. 56(e)). As to the specific facts offered by the nonmoving party, the court does not weigh conflicting evidence, but draws all inferences in the light most favorable to the nonmoving party. Id. at 630-31.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv.,809 F.2d at 630, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial. T.W. Elec. Serv., 809 F.2d at 630. Thus, the "purpose of summary judgment is to 'pierce

the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"
Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed, Anderson, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, Matsushita, 475 U.S. at 587 (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam). Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. Richards v. Nielsen Freight Lines, 602 F.Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

B.    Discussion[2]

1.    **Fourth Amendment**

In Count One, Plaintiffs contend that Defendants violated Plaintiffs' rights to be secure in their persons against unreasonable searches and seizures as guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution. FAC, at ¶ 46. Plaintiffs seek recovery of damages pursuant to 42 U.S.C. § 1983. FAC, at ¶ 46.

The Fourth Amendment protects prisoners from unreasonable searches and seizures. Strip searches that are excessive, vindictive, harassing, or unrelated to any legitimate penological

---

[2]The Court has reviewed Plaintiffs' amended complaint, the cross-motions for summary judgment, the oppositions, and the replies. The Court declines to exhaustively list every argument forwarded, every fact recited, and every piece of evidence submitted by the parties. Omission in this order of reference to various arguments, facts, or evidence should not be interpreted by the parties as an indication that the Court overlooked that argument, fact, or piece of evidence.

interest are not reasonable.  Michenfelder v. Sumner, 860 F.2d 328, 332 (9th Cir. 1988).  Neither the United States Supreme Court nor the Ninth Circuit has yet held that prisoners retain *no* privacy rights under the Fourth Amendment.  Hudson v. Palmer, 468 U.S. 517, 526 (1984) ("Fourth Amendment proscription against unreasonable searches does not apply *within the confines of the prison cell*.") (emphasis added); Bell v. Wolfish, 441 U.S. 520, 558 (1979) ("assuming [without deciding] that inmates, both convicted prisoners and pretrial detainees, retain some Fourth Amendment rights upon commitment to a corrections facility . . . ."); Somers v. Thurman, 109 F.3d 614 (9th Cir. 1997).  The Ninth Circuit has found that prisoners retain a limited right to bodily privacy.  Michenfelder, 860 F.2d at 333.

In analyzing whether searches of detainees violate the Fourth Amendment, the Supreme Court set forth a balancing test in Bell, 441 U.S. at 559.  In Bell, the Supreme Court held that visual body cavity searches of pre-trial detainees conducted after every contact visit with a person from outside the institution did not violate the Fourth Amendment.  Id. at 558.

The Bell court explained:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application.  In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails.  Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

Id. at 559.

The Ninth Circuit applied the Bell factors in Way v. County of Ventura, 445 F.3d 1157, 1179 (9th Cir. 2006).  In so doing, the Ninth Circuit found unconstitutional a strip search/visual body cavity inspection of an arrestee booked on a misdemeanor drug charge, which was conducted pursuant to a blanket policy of strip searching all arrestees on all drug offenses before placement in the general population.

*Group Strip Searches*

In this case, Plaintiffs are not contesting the practice of conducting strip searches on in-custody inmates.  Instead, they are contesting the practice of group strip searches.  There is a paucity of case law in this circuit limited to the specific issue before the Court, i.e., the

constitutionality of strip searches conducted in groups. As such, the Court looks to the <u>Bell</u> factors and considers the scope, place, manner and justification to assess KCSO's group strip searches.

The scope of intrusion associated with strip and/or visual body cavity searches has been described as a "'frightening and humiliating' invasion, even when conducted 'with all due courtesy.'" Way, 445 F.3d at 1160 (quoting Giles v. Ackerman, 746 F.2d 614, 617 (9th Cir. 1984). The place of search at issue is primarily the Lerdo facility.[3] The searches are conducted in view of other inmates in small groups.

In connection with the manner of the search, Defendants argue that the searches were not "excessive in their performance or ... calculated harassment," pointing to severe personnel limitations and security concerns to justify searches in small groups. (Defendants' Memorandum of Points and Authorities in Support of Motion for Summary Adjudication ("Defs.' Mem. Supp. Summ. J.") 9.) Defendants' assertion that the searches were not excessive or conducted in a harassing manner is conclusory and does not counter the undisputed fact that strip/vbc searches were conducted in a group setting.

To support their argument regarding the reasonable nature of the searches, Defendants direct the court to Fernandez v. Rapone, 926 F.Supp. 255 (D. Mass. 1996) and Zunker v. Bertrand, 798 F.Supp. 1365 (E.D. Wis. 1992), which involved group strip searches of inmates. The Court initially notes that neither case is binding authority, but considers Defendants' arguments in reliance on these cases. In Fernandez, the Massachusetts district court was confronted with a policy of strip/vbc searching prisoners who have received visitors to ensure, among other things, that no contraband is introduced into the facility. Inmates challenged the strip searches, which were often conducted in the presence of other inmates who also were being

_____

[3]Defendants explain that the point of entry for any inmate transported to the Lerdo Minimum facility for housing for the first time or after attending court is a room known as "Gate 1." Declaration of Ian Silva in Support of Defendants' Joint Motion for Summary Adjudication ("Silva Dec.") ¶ 12; Doc. 39. Defendants report that, from March 2005 through October 2007, no more than about 20 to 25 inmates were searched at one time at Gate 1. Silva Dec. ¶ 12. From March 2005 through October 2007, when inmates were returned to their housing assignment at the pretrial facility no more than about 10 to 15 inmates were searched at one time. Silva Dec. ¶ 13. From March 2005 through October 2007, when inmates were returned to their housing assignment at the Max-Med facility generally no more than about 5 to 7 inmates were searched at one time. Silva Dec. ¶ 14.

searched.  After determining that reasonable post-visit strip searches were constitutional, the court then considered whether conducting searches in the vicinity of other inmates who also were being searched rendered the practice unconstitutional.  Fernandez, 926 F.Supp. at 261.  In analyzing the group searches, the court employed the Bell test and concluded that "the fact that plaintiffs were often searched in the presence of other inmates being searched does not render the searches unreasonable."  Id. at 262.  The court noted that the searches were performed by correction officers of the same sex, out of the view of visitors and/or other staff, and there were no allegations of physical abuse or touching by the officers.  Id.  In addition, the court observed that inmates shared cells, showered together and were observed throughout the day by fellow inmates and male and female correction officers while dressing, bathing or even defecating.  Id. The court supported its conclusion that the group searches were not unreasonable by recognizing that it was the policy and practice at the institution for an officer to comply with an inmate's request to be searched alone.  Id.

Although Fernandez employed the Bell test, it is distinguishable from the instant matter. In Fernandez, it was the policy and practice for an officer to comply with an inmate's request to be searched alone.  Here, there is no evidence of such a policy and/or practice.

In Zunker v. Bertrand, the Wisconsin district court considered a correctional institution policy of strip searching all inmates leaving the visiting areas.  The policy was adopted in response to concerns that money and drugs were being brought into the institution during visitation.  After concluding that the constitutionality of visual body cavity searches conducted pursuant to security concerns had been established, the court considered whether the manner in which the searches were conducted, i.e., within the view of other inmates, was unreasonable. 798 F.Supp. at 1369.  In Zunker, the defendant believed that booths in a shake down room, where the searches primarily were conducted, provided privacy because the officer stood in front of the inmate during the strip search and obstructed the view of inmates waiting to be searched.  Id. at 1367-68.  The defendant initially did not install privacy curtains because of a belief that they would impede the officer's view and allow inmates to hide contraband.  Id. at 1369-70.  The court determined that defendant took additional steps to try to protect the privacy of inmates who

were subjected to strip searches. Id. at 1369. That the defendant later decided to provide inmates with the privacy curtains did not render the initial decision or the initial searches unreasonable. Id. at 1370. The court concluded that the privacy interest in not having other inmates view the strip searches did not outweigh the security interests of the prison. Id.

Zunker is readily distinguishable.[4] In Zunker, the searches at issue were conducted in booths and inmates were blocked from the view of other inmates by the officer conducting the search. Here, however, there is no evidence of booths or any other efforts undertaken to protect privacy rights. As the Zunker court acknowledged, "it is preferable to conduct strip searches in a way that protects the privacy of the inmates as much as possible." Zunker, 798 F.Supp. at 1370.

Defendants next argue that the Ninth Circuit has rejected the argument that strip searches must be conducted in a private place outside of view of other inmates. Defendants cite Thompson v. Souza, 111 F.3d 694, 699 (9th Cir. 1997) and Michenfelder, *supra*, 860 F.2d at 333-34, to support their argument. Plaintiffs counter that it is incorrect to suggest that Ninth Circuit precedent permits group strip searching. Plaintiffs distinguish Thompson and Michenfelder as not addressing group strip searches.

In Thompson, prison officials developed a plan to detect illicit drugs in the prison. The plan called for prison staff to remove pre-selected inmates, and their cellmates, from their cells, while the cells were searched for drugs and urine samples were collected. The inmates were chosen because of their prior involvement with illicit drugs. Prison officials subjected 129 of 3,400 inmates to the plan. Strip searches were not discussed in the search plan. In carrying out the plan, guards removed inmate Thompson and his cellmate from their cell and visually inspected their genitals and rectal areas as part of a strip search. The search took place within view of other prisoners on the tier outside their cell. Thompson, 111 F.3d at 697.

---

[4]Insofar as Plaintiffs seek to further distinguish Fernandez and Zunker because the matters involved convicted inmates and not pretrial detainees, there is no indication that the searches were imposed as punishment and Bell recognized no distinction between pretrial detainees and convicted inmates regarding regulations governing prison security. See Bell, 441 U.S. at 546-47 & n. 28.

Inmate Thompson argued in part that the strip searches should have been conducted in a more private location, out of view of the other prisoners. The court rejected this argument, indicating that it would not question the prison officials' judgment that the conditions required searches outside the prisoners' cells in order to protect the safety of the officers conducting them. Id. at 701. In addition, the court determined that having the searches in an entirely separate area would potentially allow prisoners to discard contraband on the way to the separate area. Id. The court found that Thompson failed to meet his burden of showing that the strip search violated a clearly established right protected by the Fourth Amendment. Id.

In Michenfelder, the Ninth Circuit considered the strip search policy at the Nevada State Prison's Unit 7, the maximum security unit for the state's 40 most dangerous prisoners. Strip/vbc searches were conducted every time a Unit 7 inmate left or returned to the unit. The searches occurred at the end of the hallway, visible to other prisoners whose cell doors opened onto the corridor and visible to some officers. The prisoner in Michenfelder argued that strip searches should be conducted within the privacy of prisoners' cells rather than out in the hallway. Although the Ninth Circuit stated that the prisoner's argument was not meritless, the court went on to conclude that the unit's layout presented only two alternative locations–the hallway or the prisoner's cell–and it would not question the prison's judgment that conditions in the unit reasonably required searches outside the prisoners' cells to protect the safety of officers conducting them. Michenfelder, 860 F.2d at 333. However, the court did "encourage [the prison] to opt for less public searches when security considerations allow[ed]." Id.

Thompson and Michenfelder involve unique circumstances. In Thompson, the court confronted a plan to detect contraband targeted to specific inmates, not a blanket policy permitting group strip searches. Similarly, the policy in Michenfelder limited searches to the state's most dangerous prisoners, which were housed in the maximum security unit, not a blanket strip search policy. Further, when considering the visible nature of the strip searches, the Michenfelder court focused its analysis on officer safety and the lack of available alternatives. 860 F.2d at 333. Nonetheless, the court encouraged less public searches when security considerations allowed.

Although Defendants have made general assertions regarding limited space and limited staffing as precluding individualized searches, Defendants made no apparent efforts to conduct individualized searches or to preserve the privacy of the individuals during searches. Michenfelder, 860 F.2d at 333 (encouraging prison to opt for less public searches when security considerations allow); Craft v. County of San Bernardino, 468 F.Supp.2d 1172, 1176 (C.D.Cal. 2006) (factor regarding manner of searches strongly favored inmates where searches were conducted *"en masse* without any attempt to limit the humiliation occasioned by conducting the searches in full view of dozens of other individuals"). Defendants' arguments regarding lack of adequate resources and limited space fall within the category of administrative burden and inconvenience. Plaintiffs properly discount these arguments as not providing a basis to permit constitutional violations. Cf. Craft, 468 F.Supp.2d at 1178 (lack of funds does not justify a constitutional violation); Stone v. City and County of San Francisco, 968 F.2d 850, 858 (financial constraints do not allow states to deprive persons of their constitutional rights). Defendants proffered no evidence of lack of available alternatives or the preclusion of officer safety, and, while not determinative, the subsequent policy change belies any assertion that there were a lack of alternatives or that safety considerations would not permit individualized searches.

Defendants' additional arguments regarding security concerns relate to the justification for the searches at issue. As the Supreme Court recognized in Bell,

> maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of convicted prisoners and pretrial detainees. Central to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves.

Bell, 441 U.S. at 546-47 (citations and internal quotations omitted). Accordingly, "when an institutional restriction infringes on a specific constitutional guarantee ... the practice must be evaluated in the light of the central objective of prison administration, safeguarding institutional security." Id. at 547.

To demonstrate "legitimate, identifiable security reasons," Defendants contend that the "facts clearly establish that in the last five years, approximately 1,900 inmates in KCSO custody have been found guilty of having some type of prohibited contraband." (Defs.' Mem. Supp.

Summ. Adj. 9; Silva Dec. ¶ 19). Since September 2007, KCSO discovered contraband possessed

by 22 inmates as a result of strip searches. (Defs.' Mem. Supp. Summ. Adj. 9; Silva Dec. ¶ 19).

Defendants' asserted justification for the policy–the prevention of contraband being introduced

into the jail–is "an extremely weighty government interest." Thompson v. City of Los Angeles,

885 F.2d 1439, 1446 (9th Cir. 1989) (prevention of the introduction of weapons or other

contraband); Way, 445 F.3d at 1161 (recognizing the difficulty of operating a detention facility

safely, the seriousness of the risk of smuggled weapons and contraband, and the deference owed

to jail officials' exercise of judgment in adopting and executing policies necessary to maintain

institutional security); Michenfelder, 860 F.2d at 332 (acknowledging "[v]isual body cavity

searches conducted after contact visits as a means of preventing prisoners' possession of weapons

and contraband, even absent probable cause, have been found reasonable by the Supreme Court")

(citing Bell, 441 U.S. at 558-60, 99 S.Ct. at 1884-85).

However, the evidence presented by Defendants' declaration does not reveal whether the

contraband discoveries were made pursuant to the group strip searches at issue or whether they

were the result of searches conducted based on a tip, reasonable suspicion or cell search. See,

e.g., Way, 445 F.3d at 1161 (requiring link between blanket strip search policy and legitimate

security concerns); Giles, 746 F.2d at 618 (requiring demonstration that security interests

warranted the serious invasion of privacy inflicted by strip searching of arrestee and concluding

the evidence of smuggling activity was minimal), overruled on other grounds by Hodgers-Durgin

v. de la Vina, 199 F.3d 1037, 1040 n.1 (9th Cir. 1999); Craft, 468 F.Supp.2d at 1178 ("evidence

does not reveal whether [contraband] discoveries were made pursuant to a search of a

pre-arraignment transferee (such as the ones at issue in the present case), to say nothing of the

fact that defendants make no attempt to demonstrate that any particular pre-arraignment

transferee had been identified as likely or potentially likely to smuggle contraband in a manner

likely to be detected by a strip and/or visual body search). Defendants have not provided

evidence suggesting that group strip searches (versus individualized searches) increase the

likelihood of contraband finds. Insofar as Defendants have provided examples of specific

inmates who were found with contraband when strip searched, these examples are not

instructive.[5]  The policy of strip searching individuals for purposes of discovering contraband is not being challenged.  The issue is group strip searches.  Defendants have provided no evidence to suggest that the contraband was more likely to be found during a group strip search than a search which afforded the individual being searched some privacy.

Defendants fault Plaintiffs for their failure to cite Powell v. Barrett, 541 F.3d 1298 (11th Cir. 2008) in which the Eleventh Circuit, *en banc*, concluded that a policy or practice of strip searching all arrestees at the time of booking was constitutionally permissible.  The Powell decision is of no precedential value in this circuit and it is unpersuasive.  In addition, although the Powell court was willing to uphold searches so long as they were no more intrusive than the visual body cavity searches in Bell, the strip search at issue in Powell did not include a visual body cavity search.  Instead, the search occurred immediately after each plaintiff had taken a group shower with other incoming detainees of the same sex and before they put on their jail jumpsuits.  The strip searches consisted of one or more guards viewing the front and back sides of the plaintiffs' naked bodies.  The exposure of flesh was no greater than what occurred in the shower.  Id. at 1313 n. 6.  The Powell court did not think it was open to "serious dispute that inmates of the same sex may be required to shower together and that guards of that sex may watch them while they are showering to prevent any misconduct." Id. (internal citations omitted).  The court concluded that it "necessarily follows that [a] visual strip search is not unconstitutional." Id.  In the instant case, however, a visual body cavity is not the apparent equivalent to viewing a detainee in the shower.

Under the guidance of Michenfelder, which encouraged less public searches when security considerations allow, the Court finds that the blanket policy of strip searching detainees in groups violates the Fourth Amendment.  Accordingly, Plaintiffs' motion for summary

---

[5]The Declaration of Ian Silva provides: "In a widely publicized incident in 2007, convicted mass-murderer Vincent Brothers managed to secret a fabricated handcuff key in his hair during a visit to court. This key was discovered during a strip search of his person....In another incident, murder suspect Andrew Hernandez was strip searched prior to a court appointment in May of 2007.  A razor blade was discovered in his shoe. In May of 2008, after strip searches had been restricted by Sheriff's Office policy, Hernandez was transported to a hospital without being strip searched. He produced a stolen handcuff key, removed his restraints, and fled.  He was recaptured by Deputies, but not before he broke into an occupied apartment in an attempt to evade the pursuit."  Silva Dec. ¶¶ 17-18.

adjudication limited to KCSO's policy of group strip searching prisoners in violation of the Fourth Amendment is GRANTED. Defendants' motion for summary adjudication as to this claim is DENIED.

*Court Returnees Ordered Released*

As to the prisoners ordered released, Plaintiffs argue that Defendants cannot justify their former policy of subjecting all prisoners who have been ordered released to a strip search. Defendants contend it is well established that where exposure to the general public presents a very real danger of contraband being passed to a detainee, a policy of strip searching the detainees upon their return from the courthouse and prior to their being placed back in the general population of the detention center is both justified and reasonable.

Defendants cite Richerson v. Lexington Fayette Urban County Govt., 958 F.Supp. 299, 307 (E.D. Ky. 1996) to support strip searching of a post-arraignment, pre-trial detainee returning from court to general population. Defendants' reliance on Richerson overlooks a key distinction. Richerson addressed a policy regarding strip searching a detainee returned to the general population following his arraignment, not a detainee who is ordered released, but subsequently returned to the general population for administrative reasons pending actual release. Richerson, 958 F.Supp. at 306 n. 4. Defendants provide no authority to support the propriety of strip searching detainees who have been ordered released.

In justification of the policy of searching court returnees who have been ordered released, Defendants argue that neither the corrections officers escorting the detainees to and from the courthouse nor the officers stationed in the jail facility know whether a detainee has been ordered released at the time the detainee returns to the jail. Defendants assert that when the court issues an order of release, the clerk of the court enters the court's order into the local computerized Criminal Justice Information System ("CJIS"). Defendants further assert that due to the time delay between the return from court and the entry of release orders, there is no way for custody staff to know which of the inmates are going to be released following their court appearances and, hence, inmates returning from court must be re-housed in the jail until further information is received later in the day regarding their release. In support of this argument, Defendants provide

only the conclusory declaration of Ian Silva, stating that the clerk may enter the order at any time before the end of the clerk's work day and, almost always, the inmate has returned to the Lerdo facility before the clerk has entered the order in CJIS. (Declaration of Ian Silva in Support of Defendants' Joint Motion for Summary Adjudication Regarding Court Returnees, Qualified Immunity and Eleventh Amendment Immunity ("Second Silva Dec.") ¶¶ 5-9; Doc. 66). Defendants provide no evidence to support the assertions as to the Superior Court's practice, the actual timing of release orders or, more importantly, evidence to suggest Defendants make any effort to determine whether a detainee has been ordered released <u>before</u> the detainee is strip searched and returned to the general population. Additionally, Defendants offer no evidence to suggest that the percentage of persons ordered released is high or that there is no means to identify or segregate them from other court returnees to prevent their return to the general population. As the <u>Craft</u> court reasoned:

> As to the court returnees entitled to release, although defendants conduct the searches in order to maintain institutional security, they create the security concerns they seek to address by failing to segregate individuals entitled to release from those who are and/or who will be returned to the general population. This category of plaintiffs are, by definition, those who became entitled to release as a result of their court appearances. A blanket policy of subjecting these individuals to strip and/or visual body cavity searches cannot be reconciled with the Fourth Amendment. *Cf. Ward v. San Diego County, 791 F.2d 1329, 1333 (9th Cir. 1986)* ("In most instances the unreasonableness of a strip search conducted prior to an [own recognizance] release determination is plain."), *cert. denied sub nom.*, 483 U.S. 1020, 107 S.Ct. 3263, 97 L.ED.2d 762 (1987).

Craft, 468 F.Supp.2d at 1179. That <u>Craft</u> may have been limited to arrestees entitled to release as opposed to detainees entitled to release is distinction without a difference here as both the arrestees and the detainees are entitled to release as a result of court appearances.

Accordingly, Plaintiffs' motion for summary adjudication limited to KCSO's policy of strip searching persons ordered released from custody in violation of the Fourth Amendment is GRANTED.

Defendants contend that the County of Kern cannot be liable for any violation of the constitutional rights fo detainees ordered released  because it is the Superior Court's policy procedure which prevents jail staff from being able to determine the inmates' status upon return to the jail rather than County's. This argument is simply without merit or factual support.

Generally, a claim against a local government unit for municipal or county liability requires an allegation that "a deliberate policy, custom, or practice . . . was the 'moving force' behind the constitutional violation . . . suffered." Galen v. County of Los Angeles, 477 F.3d 652, 667 (9th Cir. 2007); City of Canton, Ohio, v. Harris, 489 U.S. 378, 385 (1989). Contrary to Defendants' assertion, it is not the Superior Court's policy, but rather the jail policy and practice of strip searching persons ordered released and returning to them to general population. The County of Kern is not entitled to judgment as a matter of law and Defendants' summary adjudication motion regarding the court-returnee class is DENIED.

**2. Due Process Clause of the Fourteenth Amendment**

In Count One of the FAC, Plaintiffs allege that Defendants violated their rights under the Fourteenth Amendment to be free from unreasonable searches and seizures. FAC, at ¶ 46. Defendants argue that the group searches at issue do not violate Plaintiffs' rights under the Due Process Clause of the Fourteenth Amendment and seek summary adjudication.

In evaluating the constitutionality of conditions or restrictions of pretrial detention which implicate only the deprivation of liberty without due process of law, the United States Supreme Court has indicated that the proper inquiry is whether the conditions amount to punishment of the detainee. Bell, 441 U.S. at 535-37. A court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose. Bell, 441 U.S. at 538. Plaintiffs did not expressly oppose Defendants' due process arguments and count one of the FAC does not expressly allege a due process violation premised on the Fourteenth Amendment. As Defendants contend, however, there are no facts to suggest that any of the Plaintiffs were strip searched as a means for punishment. Plaintiffs have failed to demonstrate that the practice of searching inmates in small groups violates due process rights under the Fourteenth Amendment. Accordingly, to the extent that Plaintiffs have alleged a Fourteenth Amendment due process violation regarding group strip searches, Defendants' motion for summary adjudication as to this claim is GRANTED.

///

///

### 3.    Equal Protection of the Fourteenth Amendment

In Count Two, Plaintiffs allege that the strip and/or vbc searches "deprived plaintiffs and class members of the protections afforded by provisions of the 14th Amendment Equal Protection guarantees." FAC, at ¶ 47. Defendants seek summary adjudication on Plaintiffs' equal protection claim.

The Equal Protection Clause of the Fourteenth Amendment commands that no state shall deny any person equal protection of the laws. City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 439 (1985). Thus, all persons similarly situated should be treated alike. Id.; Plyler v. Doe, 457 U.S. 202, 216 (1982). Dissimilar treatment of dissimilarly situated persons does not violate Equal Protection. See Keevan v. Smith, 100 F.3d 644, 648 (8th Cir. 1996) (treatment of dissimilarly situated persons in a dissimilar manner does not violate the Equal Protection Clause); Barket, Levy & Fine, Inc. v. St. Louis Thermal Energy Corp., 21 F.3d 237, 242 (8th Cir. 1994).

Plaintiffs challenge the unequal practice of providing privacy for pre-arraignment strip searches, but not other strip searches conducted by Defendants. Plaintiffs have offered no authority to support their contention that pre-arraignment arrestees and post-arraignment persons are similarly situated. Plaintiffs' attempt to equate the two by arguing that a person's interest in maintaining the privacy of his or her body cavities is the same for both arrestees and pre-trial detainees is unpersuasive. The Court agrees with Defendants that, in this context, pre-arraignment arrestees are not similarly situated to post-arraignment detainees. Compare Giles, 746 F.2d at 615 ("arrestees for minor offenses may be subjected to a strip search only if jail officials have a reasonable suspicion that the particular arrestee is carrying or concealing contraband or suffering from a communicable disease"), with Bell, 441 U.S. at 546-47 & n. 28 (finding no basis to conclude that pretrial detainees pose any lesser security risk than convicted inmates and applying constitutional rights enjoyed by convicted prisoners to pretrial detainees; determining visual body cavity searches following contact visits did not violate Fourth Amendment and could be conducted on less than probable cause).

Insofar as Plaintiffs fault Defendants for not applying California Penal Code section 4030(m) to post-arraignment detainees in their Equal Protection claim, their argument is without merit. California Penal Code § 4030 applies "only to pre-arraignment detainees arrested for infraction or misdemeanor offenses." Cal. Pen. Code § 4030 (b). Subsection (m) requires all strip, visual and physical body cavity searches of pre-arraignment detainees to "be conducted in an area of privacy so that the search cannot be observed by persons not participating in the search." Cal. Pen. Code § 4030(m). Plaintiffs do not contend that Defendants violated section 4030. (Plaintiffs' Opp. to Defs.' Mot. Summ. Adj. 16-17 ("Since the County already conducts all pre-arraignment strip searches in private...the focus of this motion is group post-arraignment strip searches....). Plaintiffs essentially argue that Defendants should have extended the protections of section 4030 to all detainees. However, by its terms, section 4030 is limited to pre-arraignment detainees arrested on infraction or misdemeanor offenses.

Based on the above, Defendants' motion for summary adjudication as to Plaintiffs' Equal Protection Clause claim as to persons alleging group strip searches is GRANTED.

**4.    State Law Claims**

      a.    *Right to Privacy Claim*

Plaintiffs argue that the group strip search policy violated their right to privacy guaranteed by Cal. Const. Art. 1, § 1. See Cal. Const. Art. I, § 1 ("All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."). Plaintiffs complaint does not include a separate cause of action for violation of section 1, but Plaintiffs have filed a motion to amend their complaint to allege a separate cause of action. Concurrently with this order, Plaintiffs have been granted leave to file a second amended complaint alleging a section 1 cause of action and the parties arguments in connection with the section 1 claim are addressed.

Several courts have indicated that in the search and seizure context, the Article I, § 1 privacy clause of the California Constitution has not been held to establish a broader protection than that provided by the Fourth Amendment of the United States Constitution. See, e.g., Quon

v. Arch Wireless Operating Co., Inc., 529 F.3d 892, 903 (9th Cir. 2008) (the privacy protected by Article I, Section 1 of the California Constitution is no broader in the area of search and seizure than the privacy protected by the Fourth Amendment) (quoting Hill v. Nat'l Collegiate Ath. Ass'n, 7 Cal.4th 1, 30 n.9 (1994)), reh'g denied, 554 F.3d 769 (2009); Sanchez v. County of San Diego, 464 F.3d 916, 943 (9th Cir. 2006) (in search and seizure context, the Article I, Section 1, privacy clause of the California Constitution has never been held to establish a broader protection than that provided by the Fourth Amendment), reh'g denied, 483 F.3d 965 (9th Cir. 2007), cert. denied, 128 S.Ct. 649 (2007). Accordingly, the discussion of Plaintiffs' federal constitutional claim resolves both the federal and state constitutional privacy claims. Plaintiffs' motion for summary adjudication regarding this claim is GRANTED.

### b. *California Constitution § 7 and § 13*

In Count Three, Plaintiffs claim that the strip and/or visual body cavity searches violated California Constitution, Art. 1, § 7 (equal protection) and § 13 (unreasonable search and seizure). FAC, at ¶ 48. Plaintiffs seek summary judgment regarding these claims. Defendants argue that there is no private cause of action for damages for an alleged violation of § 13.

Plaintiffs may not bring damages claims directly under Article I, Section 13 or Section 7. See Brown v. County of Kern, 2008 WL 544565, *17 (E.D.Cal. February 26, 2008) (plaintiff in an excessive force case could not bring a damages claim directly under Article 1, Sections 7 or 13 of the California Constitution in part because alternative statutory and/or common law causes of action were available). As Plaintiffs cannot assert an independent cause of action for violation of sections 7 and 13, Plaintiffs are not entitled to summary judgment as to their third cause of action.

### c. *California Civil Code § 52.1(b)*

As to the group strip searches, Defendants seek summary adjudication regarding Plaintiffs' claims for damages in count four pursuant to California Civil Code § 52.1(b). FAC, at ¶ 50. California Civil Code § 52.1(b) authorizes a civil cause of action by an individual whose federal or state constitutional rights are interfered with in a manner prohibited by Cal. Civ. Code § 52.1(a). Section 52.1(a), in turn, prohibits "threats, intimidation, or coercion, or

attempts to interfere by threats, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights" guaranteed by the United States and California Constitutions. Plaintiffs base their § 52.1(b) claim, in part, on violations of the Fourth, Eighth and Fourteenth Amendments to the United States Constitution and Article I, § § 1, 7, 13 and 17 of the California Constitution. FAC, at ¶ 50.

In their motion for summary adjudication, Defendants contend that Plaintiffs cannot demonstrate an underlying violation of state or federal law in order to prevail on their claims for violation of California Civil Code section 52.1. (Defs.' Mem. Supp. Summ. Adj. 16; Doc. 37). Plaintiffs did not respond expressly to Defendants' contention in their opposition. (Doc. 54). Plaintiffs also did not seek partial summary judgment regarding their claim for damages pursuant to California Civil Code § 52.1(b). (Doc. 69). Although Plaintiffs' cross-motion seeks partial summary judgment regarding their Fourth and Fourteenth Amendment claims and their California Constitutional claims under Article I, § § 1, 7 and 13, there is no discussion of California Civil Code section 52.1. As indicated throughout this order, however, Plaintiffs have demonstrated underlying violation(s) of state and/or federal law. As Defendants premised their section 52.1 arguments on the ground that Plaintiffs could not demonstrate an underlying constitutional violation, neither party has fully briefed their arguments regarding California Civil Code section 52.1. Accordingly, Defendants' motion for summary adjudication regarding Plaintiffs' state law claims is DENIED without prejudice.

### 5. Qualified Immunity

Defendants contend that the individual defendants, Youngblood and Wimbish, are entitled to qualified immunity as to Plaintiffs' constitutional claims. "Qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.'" Saucier v. Katz, 533 U.S. 194, 200 (2001) (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)). The Court evaluates a defendant's qualified immunity defense using a two-step inquiry. Id. However, the Supreme Court recently held that this two-step inquiry is no longer an inflexible requirement. Pearson v. Callahan, --- U.S. ----, ----, 129 S.Ct. 808, 818, 172 L.Ed.2d 565 (2009) (explaining "that, while the sequence set forth [in Saucier] is often appropriate, it should no longer be regarded as

mandatory"). It is within our "sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Id.

Under Saucier's first prong, the court must determine whether, viewing the facts in the light most favorable to the plaintiff, the government employees violated the plaintiff's constitutional rights. Saucier, 533 U.S. at 201. If the court determines that a constitutional violation has occurred, under Saucier's second prong, it must determine whether the rights were clearly established at the time of the violation. Id. For a right to be clearly established, its contours " 'must be sufficiently clear that a reasonable official would understand that what he is doing violates the right.' " Id. at 202 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). The protection afforded by qualified immunity "safeguards 'all but the plainly incompetent or those who knowingly violate the law.'" Brewster v. Bd. of Educ. of the Lynwood Unified Sch. Dist., 149 F.3d 971, 977 (9th Cir.1998) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

       a.     Group Searches

           *Fourth Amendment Claims*

Defendants argue that Defendants Youngblood and Wimbish are entitled to qualified immunity regarding the Fourth Amendment claims specific to group searches because there is no clearly established case law.

At a minimum, it is established that the Fourth Amendment protects prisoners from unreasonable searches and seizures. Michenfelder, 860 F.2d at 332 (strip searches that are excessive, vindictive, harassing, or unrelated to any legitimate penological interest are not reasonable). It is also clear that prisoners retain a limited right to bodily privacy. Michenfelder, 860 F.2d at 333. However, under the second prong of Saucier, the inquiry is more particularized. The issue before the Court is whether the contours of the limited right to privacy and the protection against unreasonable searches were sufficiently clear such that the individual defendants could believe that group strip searches violated the Fourth Amendment rights of post-arraignment detainees.

Plaintiffs contend that the law has been clearly established for many years prior to 2006 that absent some compelling reason the prisoner must be afforded privacy. Plaintiffs direct the court to Amaechi v. West, 237 F.3d 356, 364 (4th Cir. 2001), Logan v. Shealy, 660 F.2d 1007, 1014 (4th Cir. 1981) and Iskander v. Village of Forest Park, 690 F.2d 126, 129 (7th Cir. 1982) in support of their contentions. In Amaechi, the plaintiff was not searched in a private holding cell, but rather on the street in front of the plaintiff's home, subject to viewing by her family, the public, and the other officers. Id. at 361-362. In disavowing the public search at issue, the Fourth Circuit noted that it had "repeatedly emphasized the necessity of conducting a strip search in private." Id. at 364.

In Logan, the Fourth Circuit considered a strip search of a female arrested on a DWI charge. A magistrate judge directed she be held for four hours or until a person took custody of her. She was taken to a holding cell and a visual strip search was conducted. There was a factual dispute over whether the window blinds in the holding cell were either open or broken and permitted anyone in the booking area to observe the strip search. Id. at 1010. In considering the issue of qualified immunity, the court reasoned:

> We think that, as a matter of law, no police officer in this day and time could reasonably believe that conducting a strip search in an area exposed to the general view of persons known to be in the vicinity whether or not any actually viewed the search is a constitutionally valid governmental "invasion of (the) personal rights that (such a) search entails."

Id. at 1014 (citation omitted).

In Iskander, the court ruled that evidence regarding a strip search of the plaintiff warranted submission to the jury. With regard to the strip search claim, the plaintiff presented evidence that the police department customarily conducted strip searches in a room with a window facing a corridor through which numerous individuals might be passing at any given time. In discussing the strip search claim, the Seventh Circuit indicated that "Defendant naturally does not maintain that routine strip searches may be conducted in a room open to the prying eyes of passing strangers consistent with the reasonableness requirement imposed on all searches under the Fourth Amendment, nor would such a contention be entertained." Iskander, 690 F.2d at 129.

25

Plaintiffs' citations are not instructive as they addressed searches conducted in potential view of the public. Plaintiffs have not identified cases that specifically proscribed the use of group strip searches of post-arraignment detainees. Based the previous discussion regarding the Fourth Amendment, the Court finds that at the time of the policies at issue, the law was not clearly established that group strip searches of post-arraignment detainees were unconstitutional. See, e.g., Bell, 441 U.S. at 558 (visual body cavity searches of pre-trial detainees conducted after every contact visit with a person from outside the institution did not violate Fourth Amendment; court did not consider blanket policy of group strip searching detainees); Thompson, 111 F.3d at 701 (upholding searches outside of prisoners' cells within view of other inmates; court did not consider generalized strip search policy permitting group searches of detainees); Michenfelder, 860 F.2d at 333 (upholding strip searches of prisoners conducted at end of hallway visible to other prisoners and some officers; court did not consider strip search policy permitting group strip searches of detainees); Craft, 468 F.Supp.2d at 1179 (policy of group strip searching arrestees returning from court entitled to release determined unreasonable; court did not expressly consider strip search policy permitting group strip searches of detainees).

Defendants' motion for summary adjudication that Defendants Youngblood and Wimbish are entitled to qualified immunity regarding Plaintiffs' Fourth Amendment claims specific to group strip searches is GRANTED.

*Fourteenth Amendment and Equal Protection Claims*

It is not necessary to address Defendants arguments that qualified immunity should be applied to Plaintiffs' Fourteenth Amendment and Equal Protection claims specific to the group searches, because there has been no determination of an underlying violation of the Fourteenth Amendment or an Equal Protection violation. Accordingly, Defendants' motion for summary adjudication that Defendants Youngblood and Wimbish are entitled to qualified immunity regarding Plaintiffs' Fourteenth Amendment and Equal Protection claims is GRANTED.

b.     Court Ordered Releases

Defendants argue that individual defendants Youngblood and Wimbish should be granted qualified immunity regarding searches of detainees upon return from court appearances

after they were ordered released. In support, Defendants contend that there is no clearly established case law that would have placed Youngblood and/or Wimbish on notice that this protocol was in any way unconstitutional. Insofar as Defendants argue that there is no clearly established case law requiring a detention facility to know the status of detainees returning from court or requiring they be segregated and held indefinitely until their status is conclusively determined, this is not the appropriate inquiry. Instead, the inquiry is whether the law at the time of the violation(s) was clearly established such that Defendants Youngblood and Wimbish would understand that strip searches of detainees ordered release were unconstitutional.

Plaintiffs argue that appellate decisions as early as 1981 have held that strip searching prisoners who have been ordered released violates the constitution. Plaintiffs partially rely on Young v. City of Little Rock, 249 F.3d 730, 735-36 (8th Cir. 2001). Young involved a female mistakenly arrested. Although the arresting officer realized the mistake, the arrestee remained in jail during the weekend until she appeared in front of a judge on Monday. During this detention, she was strip searched. After appearing in court, the judge determined that the wrong person had been arrested and ordered her released. Instead of being released, she was transported back to the county jail. While there, she was again strip searched. The strip search took place in front of five or six other people. In reviewing the events after the ordered release, the appellate court reasoned, in part, that she could have been transported back to the jail without chaining and that "certainly there was no necessity whatever to strip search a person who was wholly innocent of any charge." Id. at 736. The court characterized the "whole incident" as "shocking." Id.

Unlike Young, there is no evidence regarding the innocence of the class of court returnees. However, this factual distinction is not determinative. During the time period at issue, the law was sufficiently clear that strip searches of persons entitled to release were unreasonable. In Ward v. San Diego County, supra., the Ninth Circuit considered a policy of strip searching minor arrestees even before an own recognizance release determination was made and absent reasonable suspicion that the arrestee possessed a weapon or contraband. Ward, 791 F.2d at 1333, cert. denied, 483 U.S. 1020 (1987). The court commented that the

facts before it suggested "the easiest possible case" and reasoned that "[i]n most instances the unreasonableness of a strip search conducted prior to an [own recognizance] release determination is plain." Id. Here, a court has issued an express determination that a detainee is entitled to release. Following Ward, the facts presented here make plain the unreasonableness of strip searches conducted on court returnees. Accordingly, Defendants' motion for summary adjudication that Defendants Youngblood and Wimbish are entitled to qualified immunity regarding the searches of detainees upon return from court appearances after they were ordered released is DENIED.

### 3. Eleventh Amendment Immunity

Defendants argue that Sheriff Donny Youngblood, in his official capacity, is a policymaker for the State of California and is immune from § 1983 liability pursuant to the Eleventh Amendment. The Eleventh Amendment bars damages actions against state officials in their official capacity. See Doe v. Lawrence Livermore Nat'l Lab., 131 F.3d 836, 839 (9th Cir. 1997); Eaglesmith v. Ward, 73 F.3d 857, 859 (9th Cir. 1996); Pena v. Gardner, 976 F.2d 469, 472 (9th Cir. 1992).

Defendants rely on McMillian v. Monroe County, 520 U.S. 781 (1997) and Venegas v. County of Los Angeles, 32 Cal.4th 820 (2004) to support their contention that the Sheriff is an actor representing the state and cannot be sued under 42 U.S.C. § 1983. In McMillian, the County was sued for allegedly unconstitutional actions undertaken by the Monroe County Sheriff. The McMillian court indicated that in cases involving the liability of local governments under § 1983, the court must ask whether governmental officials are final policymakers for the local government in a particular area. Id. at 785-86. In deferring to state law in the context of section 1983, the Supreme Court closely examined the Alabama Constitution, Code and case law. After so doing, the Court concluded that "Alabama sheriffs, when executing their law enforcement duties, represent the State of Alabama, not their counties." Id. at 793. The court affirmed dismissal of the claims against the county and the sheriffs in their official capacities because the sheriff was not the final policymaker for the county.

Defendants contend that, like Alabama, the California Constitution and state laws support the conclusion that the Sheriff is an actor representing the state. Defendants further contend that examination of California law enforcement hierarchy reveals that California Sheriffs and District Attorneys are subject to the California Attorney General in regard to the official functions of their job in investigating and fighting crime and must be deemed state actors. Defendants essentially argue that "the Sheriff promulgates and maintains policies to ensure that violators of California law are held to answer the charges filed against them by the district attorney, who acts on behalf of the State, in the Superior Court, which is a division of the State." (Defs.' Mot. Sum. Adjud. Re: Court Returnees, Qualified Immunity and Eleventh Amendment Immunity 20-21 Defendants' Joint Motion for Summary Adjudication 15). Per Defendants, the policy regarding strip searches was "established on behalf of the State of California to maintain prisoners' safety while charges were pending against them or to incarcerate them on behalf of the State after they were convicted." (Defs.' Mot. Sum. Adjud. Re: Court Returnees, Qualified Immunity and Eleventh Amendment Immunity 16).

Plaintiffs counter that Defendants are judicially estopped from claiming they are "arms of the State" based on the Ninth Circuit's decision in Streit v. County of Los Angeles, 236 F.3d 552, 565 (9th Cir. 2001). Streit involved a policy whereby prisoners were not released until after all recent warrants and holds were checked. In Streit, the Ninth Circuit concluded that the Sheriff acts for the County in its oversight and management of the local jail based on its independent analysis of California's constitution, statutes and case law. Id. at 561. The court observed that Article XI, section 1(b) of the California Constitution designates sheriffs as county officers and there was no provision in the constitution which states that the sheriff's department acts for the state when managing the local jails. The Ninth Circuit further noted that although the California Attorney General has statutory control over the sheriffs in a law enforcement capacity, in California, the counties hold the ultimate power over the jails. Id. In so doing, the Ninth Circuit compared Cal. Gov. Code § 12560 (granting attorney general powers over sheriffs' activities relevant to the "investigation or detection of crime"), with Cal. Gov. Code § 25303 (granting the county boards of supervisors broad fiscal and administrative powers for the

29

management of the individual county jails), and also examined California Government Code provisions supporting the county's liability, including Cal. Gov. Code §§ 815.2 (monetary damages paid by county), 24000(b) (sheriff included as county officer).

Defendants argue that at the time of the Streit ruling, the California Supreme Court had not issued its ruling in Venegas, 32 Cal.4th 820. In Venegas, the court considered the issue of whether a sheriff acts on behalf of the state or county when conducting a criminal investigation, including detaining suspects and searching their home and vehicle. The defendants, a county acting on behalf of its sheriff's department and sheriff, claimed they were immune from liability under the Eleventh Amendment because the sheriff acts on behalf of the state rather than the county when engaged in investigating crime. Id. at 829. The court concluded that sheriffs act on behalf of the state when performing law enforcement activities. Id. at 839. In so concluding, the court relied on two other state decisions that were confined to situations in which district attorneys and sheriffs were actually engaged in performing law enforcement duties, such as investigating and prosecuting crime, or training staff and developing policy involving such matters. Id. at 838.

The Venegas decision does not overturn Ninth Circuit precedent on this issue regarding a federal statute and does not control on issues of federal law. See Brown, 2008 WL 544565, at * 12 (declining to conclude that county sheriffs act on behalf of the state when conducting law enforcement activities). This Court is bound by Ninth Circuit precedent and declines to hold that the Kern County Sheriffs were acting on behalf of the State of California.

_____Defendants' motion for summary adjudication against Plaintiffs' causes of action for § 1983 claims on that ground that the Sheriffs are state actors is DENIED.

### 4.    County of Kern

Defendants' contend that the County of Kern is an improper party to this action and request that their motion for summary adjudication as to any claims asserted against the County be granted. To support this contention, Defendants argue:

> the Kern County Sheriff in his official capacity, in addressing and fighting crime within the confines of the jail, acts on behalf of the State of California.
> Therefore, in that capacity he did not act on behalf of the County of Kern. Thus,

because he was acting for the State and not the County of Kern, no liability can be imputed to the County of Kern under <u>Monell</u> for any actions related to the strip search of detainees returning to the jail from the Kern County Superior Court for appearances related to the criminal charges against them. Accordingly, the County of Kern is an improper party to this action....

(Defs.' Mot. Sum. Adjud. Re: Court Returnees, Qualified Immunity and Eleventh Amendment Immunity 20-21). As the Court has rejected Defendants' argument that the Kern County Sheriff is acting on behalf of the State, the Court also rejects Defendants' related argument that the County cannot be liable. Defendants' motion for summary adjudication as to section 1983 claims asserted against the County is DENIED.

## CONCLUSION AND ORDER

For the reasons set forth above,

1. Plaintiffs' motion for partial summary judgment/summary adjudication limited to KCSO's policy of group strip searching prisoners in violation of the Fourth Amendment is GRANTED. Defendants' motion for summary adjudication as to this claim is DENIED.

2. Plaintiffs' motion for partial summary judgment/summary adjudication limited to KCSO's policy of strip searching persons ordered released from custody in violation of the Fourth Amendment is GRANTED. Defendants' summary adjudication motion regarding the court-returnee class is DENIED.

3. Defendants' motion for summary adjudication limited to the extent that Plaintiffs have alleged a Fourteenth Amendment due process violation regarding group strip searches is GRANTED.

4. Defendants' motion for summary adjudication as to Plaintiffs' Equal Protection Clause claim as to persons alleging group strip searches is GRANTED.

5. Plaintiffs' motion for partial summary judgment/summary adjudication regarding violation of California Constitution, Article I, Section 1 is GRANTED.

6. Plaintiffs' motion for partial summary judgment regarding their third cause of action for violation of California Constitution Article 1, section 13 is DENIED.

7. Defendants' motion for summary adjudication regarding Plaintiffs' state law claims pursuant to California Civil Code section 52.1 is DENIED without prejudice.

1      8.  Defendants' motion for summary adjudication that Defendants Youngblood and

2   Wimbish are entitled to qualified immunity regarding Plaintiffs' Fourth Amendment claims

3   specific to group strip searches is GRANTED.

4      9.  Defendants' motion for summary adjudication that Defendants Youngblood and

5   Wimbish are entitled to qualified immunity regarding Plaintiffs' Fourteenth Amendment and

6   Equal Protection claims is GRANTED.

7      10.  Defendants' motion for summary adjudication that Defendants Youngblood and

8   Wimbish are entitled to qualified immunity regarding the searches of detainees upon return from

9   court appearances after they were ordered released is DENIED.

10     11.  Defendants' motion for summary adjudication against Plaintiffs' causes of action for

11  § 1983 claims on that ground that the Sheriffs are state actors and are entitled to Eleventh

12  Amendment immunity is DENIED.

13     12.  Defendants' motion for summary adjudication as to section 1983 claims asserted

14  against the County is DENIED.

15

16     IT IS SO ORDERED.

17     **Dated:    March 31, 2009**                    _____ /s/ **Dennis L. Beck**_____
                                                         UNITED STATES MAGISTRATE JUDGE
18

19

20

21

22

23

24

25

26

27

28