Barrett S. Litt, SBN 45527
Paul J. Estuar, SBN 167764
E-Mail: pestuar@littlaw.com
LITT, ESTUAR & KITSON, LLP
1055 Wilshire Boulevard, Suite 1880
Los Angeles, California 90017
Telephone: (213) 386-3114/ Facsimile: (213) 380-4585

Robert Mann, SBN 48293
Donald W. Cook, SBN. 116666
E-Mail: doncook@earthlink.net
ATTORNEYS AT LAW
3435 Wilshire Boulevard, Suite 2900
Los Angeles, California 90010
Telephone: (213) 252-9444/ Facsimile: (213) 252-0091

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

MARSIAL LOPEZ, et al., each
individually, and as class
representatives,

        Plaintiffs,

 vs.

SHERIFF DONNY YOUNGBLOOD,
et al.,

        Defendants.

Case No. CV-F-07-0474 DLB
[Hon. Dennis L. Beck]

**ORDER AWARDING ATTORNEYS' FEES
AND COSTS**

DATE:         AUGUST 26, 2011
TIME:         9:00 A.M.
CRTRM:      9

## I.    INTRODUCTION

On June 21, 2007, Plaintiff Marsial Lopez, individually and as class representative,
filed the instant civil rights action on March 27, 2007. On June 21, 2007, Plaintiffs
Marsial Lopez, Sandra Chavez and Theodore Medina individually, and as class
representatives, filed a First Amended Complaint ("FAC") against Kern County, the Kern
County Sheriffs Department ("KCSD"), Kern County Sheriff Donny Youngblood

(officially and individually), and former Kern County Sheriff Mack Wimbush (individually).

Plaintiffs brought this class action challenging the manner in which people are searched in Kern County's jails. Specifically, Plaintiffs, and the classes which they represented, prevailed in District Court with their constitutional challenge of two KCSD policies: strip searching[1] persons returning to jail from court who, as a result of their court appearance, became entitled to release, and the policy of strip searching (whether pre-trial, post-trial, or post-release) in groups without individual privacy. For purposes of this motion, these classes shall be referred to as the Post Release Class and Group Strip Search Class, respectively. There is no dispute as to the existence of either of the two above-mentioned policies, or of the fact that KCSD practices were in conformance thereto until their repeal in October, 2007, shortly after the filing of the instant lawsuit.

On March 31, 2009, this Court granted partial summary judgment/summary adjudication on the following: 1) KCSD violated the Fourth Amendment by routinely strip searching court-ordered releasees, and 2) KCSD violated the Fourth Amendment by routinely strip searching inmates in groups without privacy. This Court also denied Defendants' motion for summary adjudication on a number of issues, including whether the Sheriffs, in their jail operations function, are state actors and entitled to Eleventh Amendment immunity.

On that same date, this Court granted Plaintiffs' Motion for Class Certification. The Court certified the following two classes:

<u>Post-Release Class:</u> People who, from March 27, 2005, up to October 1, 2007, or the time of judgment or settlement of the case: (a) were in KCSD custody; (b) were taken from jail to court; (c) became entitled to release after going to court; and (d) were strip

---

[1] The term "strip search" as defined by KCSD policy includes not only "visual inspection of the underclothing, female breasts, buttocks, or genitalia of such person," but also "visual inspection of the anus and/or vaginal area" in such a manner as to "expose body cavity orifices," also referred to as a visual body cavity search ("vbc search").

and/or vbc searched before release pursuant to KCSD's blanket policy, practice and/or custom to strip/vbc search all court returns, including those entitled to release.

<u>Group Strip Search Class:</u> People who, from March 27, 2005, up to October 1, 2007, or the time of judgment or settlement of the case: (a) were in KCSD custody; (b) were subjected to a strip and/or vbc search in a group with other inmates also being strip/vbc searched, which search did not afford privacy from others; and (c) whose strip searches were conducted pursuant to KCSD's blanket policy, practice and/or custom to regularly conduct strip/vbc searches in a group setting.

Defendants filed an appeal on April 28, 2009, on behalf of individual Defendants Donny Youngblood and Mack Wimbish. That was a direct appeal of the denial of 11th Amendment immunity. Defendants also filed a Rule 54(b) motion on April 28, 2009, requesting: 1) entry of judgment on all §1983 claims against the County on 11th Amendment immunity grounds, and 2) entry of judgment on the federal and California law claims for group strip searches (but not for post-release strip searches) regardless of whether 11th Amendment immunity is available. This Court denied the Rule 54(b) motion on July 1, 2009. On May 22, 2009, Defendants filed a §1292(b) motion for certification of issues for appeal along with a request for a stay. The §1292(b) motion was granted on July 15, 2009, but the request for stay pending resolution of this petition was denied without prejudice. This matter was pending on appeal before the Ninth Circuit when the parties reached a mediated class action settlement

The settlement agreement provides as follows:

(a)     A person who was subjected for the first time during the class period (between March 27, 2005, and October 1, 2007) to a Kern County strip search after a Court ordered him or her to be released from all pending charges, and the person was in fact entitled to immediate release based on that order, will receive a payment of $1500 (subject to certain possible adjustments described below in ¶¶d and e).

(b)     A person who was subjected for a second time during the class period

(between March 27, 2005, and October 1, 2007) to a Kern County strip search after a Court ordered him or her to be released from all pending charges, and the person was in fact entitled to immediate release based on that order, will receive a payment of $750 in addition to the $1500 for the first strip search (again subject to certain possible adjustments described below in ¶d.) No additional payments will be made to persons subjected to more than two such searches.

(c)    A person who was strip searched in a group while in Kern County custody will receive a one time only payment (regardless of the number of times the person was strip searched in a group) of $200 (subject to certain possible adjustments described below in ¶¶2(d)).

(d)    Notwithstanding the amounts set forth above to be paid to each class member, the parties have agreed to a maximum payout for each class, the amount of which was derived from their joint estimate that claims are unlikely to exceed approximately 28% of the class members (and, based on past experience, will likely be meaningfully lower than that). Accordingly, the amounts to be paid Class Members (not including class representatives) will be adjusted if the amount to be awarded eligible Class Members in either the Post-Release or Group Strip Search who make claims exceeds the total amount to be paid to that Class. In that event, the amount that members of that class receive will be adjusted on a pro-rated basis, which would result in payment to individual Class Members of amounts lower than those set forth above. The total amount paid to Post-Release Class Members is capped at $2,335,830.00 and, if claims exceed that, they will be adjusted on a pro-rated basis so that the total payment to such Post-Release Class Members (first and second time combined) will not exceed that total. The amount paid to Group Strip Search Class Members is capped at $2,016,000.00 and, if claims exceed that, they will be adjusted on a pro-rated basis so that the total

payment to such Group Strip Search Class Members will not exceed that total.

(e)   The Claims Administrator shall deduct from any claim payment amounts owed by a claim participant for liens or court orders for restitution, child support, debts owed to the County of Kern or any statutory liens, not to exceed 50% of the amount to which the class member would otherwise be entitled. By filing a Claim Form, the class member agrees to allow the Claims Administrator access to his or her records regarding child support or potential statutory liens.

(f)   Class administration costs.

(g)   $2,000,000 in attorneys' fees, plus class counsel costs not to exceed $65,000.

(h)   $30,000 damages award to each Named Plaintiff, of whom there are three.

This Court has approved that settlement in a separate order. See Final Order of Approval and Settlement, dated August 31, 2011.

Plaintiffs filed a motion for attorneys' fees seeking $2,000,000 (28% of the class fund) in fees plus class counsel costs of $ $44,393.60. For the reasons stated below, the Court awards Plaintiffs' counsel $2,000,000 as attorneys' fees, plus $ $44,393.60 in costs.

## II.   ANALYSIS OF THE FACTORS IN DETERMINING AN APPROPRIATE ATTORNEYS' FEE AWARD.

It is well settled in the Ninth Circuit that, "[i]n a common fund case, the district court has discretion to apply either the lodestar method or the percentage-of-the-fund method in calculating a fee award." *Fischel v. Equitable Life Assurance Soc'y of the U.S.*, 307 F.3d 997, 1006 (9th Cir.2002); *see also, e.g., Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989); *In re Washington Public Power Supply System Securities Litigation*, 19 F.3d 1291, 1295 (9th Cir. 1994)). While the court has discretion to use either method, "the primary basis of the fee award remains the

percentage method." *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1050 (9th Cir. 2002). *See also Six Mexican Workers v. Arizona Citrus Growers,* 904 F.2d 1301, 1311 (9th Cir.1990) ("benchmark percentage [of 25% of the fund] should be adjusted, or replaced by a lodestar calculation, when special circumstances indicate that the percentage recovery would be either too small or too large in light of the hours devoted to the case or other relevant factors"); *In Re Rite Aid Corp. Securities Litigation*, 396 F.3d 294, 307 (3d Cir. 2005)) ("the lodestar cross-check does not trump the primary reliance on the percentage of common fund method").

Many courts and commentators have recognized that the percentage of the available fund analysis is the preferred approach in class action fee requests because it more closely aligns the interests of the counsel and the class, i.e., class counsel directly benefit from increasing the size of the class fund and working in the most efficient manner. *See, e.g., Swedish Hosp. Corp. v. Shalala,* 1 F.3d 1261, 1266-67 & fn.3, 1269-71 (D.C.Cir.1993) (noting that the lodestar approach "encourages significant elements of inefficiency", by giving attorneys an "incentive to spend as many hours as possible" and "a strong incentive against early settlement"; the percentage approach "more accurately reflects the economics of litigation practice", and "the monetary amount of the victory is often the true measure of success, and therefore it is most efficient that it influence the fee award"; accordingly, "we join the Third Circuit Task Force and the Eleventh Circuit, among others, in concluding that a percentage-of-the-fund method is the appropriate mechanism for determining the attorney fees award in common fund cases"); *Camden I Condominium Ass'n v. Dunkle,* 946 F.2d 768, 774 (11th Cir.1991) (holding in a reversionary common fund case "that the percentage of the fund approach is the better reasoned in a common fund case. Henceforth in this circuit, attorneys' fees awarded from a common fund shall be based upon a reasonable percentage of the fund established for the benefit of the class."); Silber and Goodrich, *Common Funds and Common Problems: Fee Objections and Class Counsel's Response*, 17 RevLitig 525, 534 (1998) (the percentage approach avoids numerous drawbacks of the lodestar approach and is

preferable because "the attorneys will receive the best fee when the attorneys obtain the best recovery for the class. Hence, under the percentage approach, the class members and the class counsel have the same interest -- maximizing the recovery of the class.").

Among the drawbacks to the lodestar method listed by Silber & Goodrich are that the lodestar method increases the amount of fee litigation; the lodestar method lacks objectivity; the lodestar method can result in churning, padding of hours, and inefficient use of resources; when the lodestar method is used, class counsel may be less willing to take an early settlement since settlement reduces the amount of time available for the attorneys to record hours; and the lodestar method inadequately responds to the problem of risk. *Id.* at pp. 529-532. *See also Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1050 n.5 (9th Cir. 2002) ("it is widely recognized that the lodestar method creates incentives for counsel to expend more hours than may be necessary on litigating a case so as to recover a reasonable fee"); *Mashburn v. National Healthcare, Inc.,* 684 F.Supp. 679, 689-91 (M.D.Ala.1988) (cataloguing criticisms of the lodestar approach to fee calculation); *Manual for Complex Litigation* 4th Ed. §14.121 (2004) ("in practice, the lodestar method is difficult to apply, time consuming to administer, inconsistent in result, …capable of manipulation, …[and] creates inherent incentive to prolong the litigation").

Silber and Goodrich advocate that class fund fees should not diminish on a percentage basis, as some courts have done, because that undermines the full alignment between class counsel and the class. This is because, if the percentage of fees go down as the size of the fund goes up, a substantial increase in the size of the fund may be only marginally beneficial to the class counsel while it may be extremely beneficial to the class, with the result being that the economic interests of the class and counsel become misaligned. They also reviewed two studies of fee awards in common fund cases. One study was the FJC Report discussed above. The other study, done by National Economic Research Associates, an economics consulting firm, in 1994, found that attorneys' fees in these class actions averaged approximately 32% of the recovery, regardless of the case size, and averaged 34.74% when the fees and expenses were added together. Silber and

Goodrich, *supra,* at 545-546. Silber and Goodrich conclude with the observation that a 33% fee award is both reasonable, and in line with the general market for contingent fee work. *Id*. at 546-549.

Although not mandated by the Ninth Circuit, courts often consider the following factors when determining the benchmark percentage to be applied: (1) the result obtained for the class; (2) the effort expended by counsel; (3) counsel's experience; (4) counsel's skill; (5) the complexity of the issues; (6) the risks of non-payment assumed by counsel; (7) the reaction of the class; and (8) comparison with counsel's lodestar. *See, e.g., In re Heritage Bond Litigation,* 2005 WL 1594403, *18 (C.D. Cal. 2005)*; In re Quintus Sec. Litig.,* 148 F.Supp.2d 967, 973-74 (N.D. Cal. 2001).

### A.   THE COMPLEXITY OF THE ISSUES AND THE RISK OF NON-PAYMENT

Congress recognized the complexity of civil rights cases when the civil rights attorneys' fee statute (42 U.S.C. §1988) was passed in 1976. The legislative history states, "It is intended that the amount of fees awarded under S. 2278 (42 U.S.C. §1988) be governed by the same standards which prevail in other types of equally complex federal litigation, such as antitrust cases and not be reduced because the rights involved may be nonpecuniary in nature." S.Rep.No. 94-1011, 1976 U.S.Code Cong. & Admin.News at 5913.

### 1.   The Legal Issues Are Complex And Unsettled.

The issues involved in this case involve complex issues of constitutional law in an area where considerable deference is given to jail officials. *See Way v. County of Ventura,* 445 F.3d 1157, 1161 (9th Cir. 2006) ("We recognize the difficulty of operating a detention facility safely, the seriousness of the risk of smuggled weapons and contraband, and the deference we owe jail officials' exercise of judgment in adopting and executing policies necessary to maintain institutional security."); *Craft v. County of San Bernardino*, 468 F.Supp.2d 1172, 1176 (C.D. Cal. 2006) (quoting *Way*).

The settlement in this case encompassed two categories of class members. At the time this lawsuit was filed, the law was not settled in either of the areas encompassed by

the suit and, in the course of the lawsuit, there were developments that can fairly be stated as problematic for Plaintiffs. The law in the Ninth Circuit, when this suit was filed, was that reasonable suspicion was required before strip searching pre-arraignment detainees, but all of the cases involved those not placed in the general population. *See, e.g., Way,* 445 F.3d at 1159 (pre-arraignment arrestees charged with being under the influence of drugs); *Giles v. Ackerman,* 746 F.2d 614, 616-17 (9th Cir.1984) (per curiam), *overruled on other grounds by Hodgers-Durgin v. de la Vina,* 199 F.3d 1037, 1040 n.1 (9th Cir.1999) (en banc) (pre-arraignment arrestee charged with traffic violation); *Kennedy v. Los Angeles Police Dep't,* 901 F.2d 702, 711 (9th Cir.1990) (as amended), *implied overruling on other grounds recognized by Act Up!/Portland v. Bagley,* 971 F.2d 298, 301 (9th Cir.1992) (pre-arraignment arrest for felony grand theft); *Fuller v. M.G. Jewelry,* 950 F.2d 1437, 1446 (9th Cir.1991) (same).

Since this Court ruled in Plaintiffs' favor, the Ninth Circuit decided *Bull v. City & County of San Francisco*, 595 F.3d 964, 966 (9th Cir. 2010) (en banc) (policy requiring the strip search of all arrestees who were to be introduced into San Francisco's general jail population for custodial housing constitutional). The first class certified by this Court involved the policy of strip/visual body cavity searches of post-release inmates. While Plaintiffs assert that *Bull* does not govern the constitutionality of strip searches of persons ordered released, Defendants argued in the District Court, even before *Bull*, that *Powell v. Barrett,* 541 F.3d 1298 (11th Cir. 2008) (en banc) (finding policy of strip searching all arrestees placed in general population constitutional) should apply to the claims here. *See Lopez v. Youngblood*, 609 F. Supp. 2d 1125, 1138 (E.D. Cal. 2009) (discussing application of *Powell* to claims here). There can be little question that they intended to do the same in the Court of Appeals, relying as well on *Bull*.

That there is substantial risk in any litigation of this type is confirmed not only by the *Bull* and *Powell* decisions discussed *supra*, but in the subsequent decision of the Third Circuit finding the policy of conducting strip searches of all arrestees upon their admission into the general prison population constitutional. *Florence v. Bd. of Chosen*

*Freeholders of County of Burlington*, 621 F.3d 296 (3d Cir. 9/21/2010), *cert. granted*, 2011 WL 202772 (4/4/2011). The Supreme Court is now scheduled to take up the issue next term in the *Florence* case.

The authority upon which Plaintiffs were able to rely was relatively scant. *See Young v. City of Little Rock,* 249 F.3d 730 (8th Cir. 2001) (strip search of acquitted inmate on return to jail violated constitutional rights); *Logan v. Shealy*, 660 F.2d 1007, 1013 (4th Cir. 1981) (no qualified immunity for strip search of person ordered released on personal recognizance); *Jones v. Cochran,* 1994 U.S. Dist. LEXIS 20625 (S.D. Fla. 1994) (practice of returning in custody acquitted defendants to county jail for out-processing, including checking for wants and holds, and thereby strip searching them, unconstitutional); *Gary v. Sheahan*, 1998 WL 547116, *14 (N.D. Ill. 1998) ("at least as to those returnees who have no pending charges or holds, there is no *need* to return them to Division and therefore no need to perform a strip search"; denying qualified immunity) (emphasis supplied); *Hayes v. Sheahan*, 1998 U.S. Dist. LEXIS 13378, 40-41 (D. Ill. 1998); *Bynum v. District of Columbia*, 257 F. Supp. 2d 1 (D.D.C. 2002) (motion to dismiss complaint on ground of strip searching released court returnees denied); *Calvin v. Sheriff of Will County*, 405 F. Supp. 2d 933, 946 (N.D.Ill. 2005) (granting partial summary judgment for policy of strip searching court returns entitled to release); *Craft ,* 468 F.Supp.2d at 1179 (same). Although Plaintiffs believed that the post-release issues here are distinct from the pre-arraignment cases, the outcome of this appeal was not certain. This case law is now contested based on *Bull*, *Powell* and *Florence*.

The second class certified by the Court concerned those strip searched in a group. While there is ample law on the fact that privacy is a factor in the overall assessment of the constitutionality of a strip search, there is very little law stating that a strip search in a group setting is in and of itself a constitutional violation. Only a couple of district court cases – all in the Fourth Circuit and emanating from *Logan v. Shealy*– discussed the constitutionality of the policy or custom of strip searching inmates in groups on return from court. *See Smith v. Montgomery County, Md*., 547 F.Supp. 592, 599 (D.Md. 1982)

(*Smith I*) (enjoining, *inter alia*, any policy that permitted conducting visual searches other than in private; "with respect to conducting a strip search in private, even if all defendants' arguments were accepted, there is no reason why the initial search of incoming detainees cannot be done in private"); *Smith v. Montgomery County, Md.*, 607 F.Supp. 1303, 1305 (D.C. Md. 1985) (*Smith II*) (emphasis supplied)(new judge in the same case affirmed the injunction previously entered; "based on *Logan*, the Center's indiscriminate strip search policy and failure to conduct strip searches in private is unconstitutional"; no qualified immunity); *Jones v. Murphy*, 470 F.Supp.2d 537, 548 (D. Md. 2007) (arrestees "being strip searched in a non-private setting also violates what appears to be a clearly established right in the Fourth Circuit") (citing *Amaechi v. West*, 237 F.3d 356, 364 (4th Cir. 2001) ("we have repeatedly emphasized the necessity of conducting a strip search in private"); *Polk v. Montgomery County, Maryland,* 782 F.2d 1196, 1201 (4th Cir.1986) (whether search is conducted in private is "especially relevant in determining whether a strip search is reasonable under the circumstances").

Despite these obstacles, Plaintiffs' counsel succeeded in obtaining a favorable determination from this Court, and succeeded in reaching a mediated settlement despite subsequent decisions that would have been used to call into question the summary judgment in Plaintiffs' favor.

### 2.    The Data Issues In Cases Of This Type Are Complex.

Properly handling the data in cases of this type is also complex and requires a high degree of sophistication. There are relatively few attorneys qualified to handle a case such as this to the maximum degree of effectiveness. In cases like this, proper use of the data, along with establishing the policies or customs being challenged, are the factual keys to the case. It is through the data that members of the class are identified. This is a sophisticated process, requiring counsel familiar with both the facts of the case and how to use the data. Jail data is not configured to straightforwardly answer the questions for which answers are needed to determine class composition. For example, in this case, to determine membership in Post-Release Class One, Plaintiffs had to look at location and

housing data, data showing court appearances, determinations of what the last court appearance was, and determinations of whether there were any detainers or holds justifying keeping the inmate in the jail.

Code had to be written to take into account all of those factors. Then, the analysis had to be presented to Defendants, who raised various objections or differences of opinion, and the process had to be re-done. This is just one example. Defendants' consultants devoted many hours to working with Plaintiffs' counsel and analyzing the data. Plaintiffs' counsel spent many hours interacting with the consultants, analyzing the data, and working with it to prepare their mediation statement. Plaintiffs' counsel prepared materials showing the potential damages from various perspectives. They submitted a 37-page mediation brief.

### 3.    Reaching A Settlement Was Difficult.

Another example of complexity, and counsel's skill, arose during settlement discussions. Defendants' insurance company was very resistant to the numbers ultimately agreed upon. There were two days of mediation during the summer, which ended with virtually no progress having been made. Plaintiffs' counsel worked with retired United States District Judge Raul Ramirez and defense counsel to see if productive mediation sessions could be held in the future.

### B.    THE RISKS OF NON-PAYMENT WERE SUBSTANTIAL

There was substantial risk of non-payment facing Plaintiffs' counsel. While the County had the resources to pay a judgment, the risk lay in establishing that there were actually County policies that were illegal. Strip search litigation in general is inherently risky because of the deference given jail officials, because a split in circuits has developed, and because the case law that does exist is not directly on point. Seeking large amounts of money from government entities always carries risks of politics entering into the equation. In addition, the classes at issue here were not clear cut.

Civil rights cases such as this face particular challenges for class action practitioners not present in other class litigation because 1) policy or custom must be

proven under *Monell*, 2) great deference is given to jails in addressing security issues, 3) the law often differs from circuit to circuit, and 4) there is a greater risk than normal that the entire legal landscape could change by virtue of a change in the law, both at the circuit level (which has happened) and at the Supreme Court level (where the issue has not been addressed since *Bell v. Wolfish*, 441 U.S. 520 (1979), almost 30 years ago). This is confirmed by the recent grant of certiorari in *Florence, supra. See Craft v. County of San Bernardino*, 624 F.Supp.2d 1113, 1118 (C.D. Cal. 2008) ("As a general proposition, the case law in this area [jail strip searches] is far from stable", quoting *McBean v. City of New York*, 233 F.R.D. 377, 387 (S.D.N.Y. 2006)).

Class counsel declined substantial other work to pursue this case. Indeed, Mr. Litt and Mr. Estuar, who concentrate mostly on civil rights class actions, handle only about 10-12 cases at a time, for each of which it is anticipated that the range of 1500-5000 hours or more will be required to see the case to completion. In this case, by the conclusion of the case, Plaintiffs' counsel estimated that the hours will be at the low end of that range. The hours are as low as they are only because Plaintiffs' counsel are so experienced in litigation of this type. Without such expertise, it is likely that the hours other counsel, even those experienced in civil rights litigation, would expend to accomplish the same result would substantially increase, possibly as much as double or more

### C.   THE EFFORT EXPENDED BY COUNSEL.

Counsel litigated this case to the eve of trial. The work performed included: 1) extensive investigation of the underlying circumstances, including speaking with scores of class members; 2) preparation of the complaint and the amended complaint; 3) the Rule 26 conference and report; 4) three sets of requests for production of documents; 5) extensive analysis of documents produced; 6) two sets of interrogatories; 7) six depositions; 8) multiple summary judgment motions by both sides, on all of which Plaintiffs prevailed; 9) a successful contested motion to certify the classes; 10) retention of data consultants and extensive analysis of computerized jail data; 11) contested

motions to certify an interlocutory appeal; 12) preparation of a 37 pages mediation brief and four mediation sessions; 13) preparation of extensive settlement documents, including settlement agreement, preliminary and final approval orders, class notice and claim forms; 14) ongoing work with the Class Administrator, and 15) continuing contact with class members offering information and assistance as requested.

In summary, Class Counsel's efforts were extensive and involved all that occurs in a case that is litigated up to the eve of trial.

### D.   THE RESULT OBTAINED FOR THE CLASS

This case was hard fought. The class members are people of little means. All the work was performed on a contingent fee basis. The settlement was the result of arm's length negotiations entered into only after Plaintiffs won the class certification and summary judgment motions, and while the case was pending in the Ninth Circuit. Even then it required approximately a year or more of settlement efforts.

The financial terms of the settlement are very favorable to class members. Post-release class members receive $1500 for a first time and $750 for a second offense. This is considerably higher than the average recovery in many other strip search class actions. See Declaration of Barrett S. Litt, ¶22. While this is partly explained by the scale of the other cases compared to this one, the fact remains that class members are receiving very favorable payments. In addition, those for whom searches would have otherwise been legal under Plaintiffs' theories had they been conducted in privacy (i.e., those strip searched in groups) are receiving money. All of this is due exclusively to Class Counsel's efforts. Although there is a claims cap, after which awards would be pro-rated, this was done to provide Defendants a certain degree of certainty. Plaintiffs' counsel have extensive experience in class actions of this type. The claims cap is well above the expected claims rate based on past experience, and the actual claims received even with the extended deadline.

The results in this case cannot be judged solely by the monetary component of the settlement. As a result of the litigation, the County long ago ceased all of the strip search

practices addressed in this settlement. That is a major accomplishment, particularly in light of the standing limitations imposed on such cases. Thus, as a result of counsel's efforts, tens of thousands of future inmates have been spared the "embarrassing and humiliating experience", and "extensive intrusion on personal privacy", that a strip search, "regardless of how professionally and courteously conducted", necessarily entails. In some cases, they will not be strip searched at all (post-release inmates) and in others, if they are strip searched, it will be done with much greater privacy. *Hunter v. Auger,* 672 F.2d 668, 674 (8th Cir.1982).

Unlike most class actions, Plaintiffs were persons charged with crimes and, thus, not people generally considered sympathetic or desirable by the public at large. *Cf., e.g., Battle v. Anderson* 564 F.2d 388, 398 (10th Cir. 1977) (in prisoner civil rights class action, "plaintiffs' class are generally a feared and despised class"); *Morales Feliciano v. Hernandez Colon*, 697 F.Supp. 51, 60 (D.Puerto Rico 1988) ("The general population's attitude toward those who commit or are accused of committing crimes is understandably one bordering in despise. Many Puerto Ricans believe that since plaintiffs are criminals, they deserve the conditions under which they live in the prisons.").

### E.   COUNSEL'S EXPERIENCE

Class Counsel are highly experienced litigators in the fields of civil rights and class actions. Mr. Litt is known as having a particular expertise in civil rights class actions and other complex multi-party civil rights cases, especially law enforcement class actions. He has both spoken and published on the issue of strip search and law enforcement class actions at some length, and is counsel in several other pending class actions, both in California, and in other parts of the country (Washington, D.C., Baltimore, MD and Atlanta, GA). In addition, he has several $1 Million plus civil rights trial verdicts and settlements, including a $22.5 Million verdict against the City of Long Beach, which is the largest Fair Housing verdict on record, and the largest pre-trial settlement in California history for a wrongful conviction, for which he recently received a CLAY (California Lawyer Attorney of the Year) Award.

Mr. Litt's Declaration describes the participants from his firm in preparing this case, and Mr. Mann's Declaration describes it for participants from his firm. The key attorneys who worked on this matter – Mr. Litt, Mr. Estuar, Mr. Mann and Mr. Cook – have long histories of working on law enforcement civil rights cases in general, and law enforcement civil rights class actions in particular. Paul Estuar – formerly an associate and now a partner in Mr. Litt's firm – is an experienced civil rights attorney. He has worked on all of the law enforcement class actions listed in Mr. Litt's declaration and CV. He handled much of the day-to-day litigation in this case. Mr. Mann and Mr. Cook are partners who specialize in police misconduct cases. They have handled hundreds of police misconduct cases. They were co-counsel with Mr. Litt and Mr. Estuar in *Williams v. Baca*, and are currently co-counsel with him in the pending Southern California law enforcement class actions listed in Mr. Litt's resume.

### F.   COUNSEL'S SKILL

This issue has been answered by the discussion above. Counsel in this case are highly skilled attorneys in the field of civil rights and civil rights class actions, particularly law enforcement class actions.

### G.   THE REACTION OF THE CLASS

The Claims Administrator reports receiving 7,689 claims through August 23, 7 opt-outs, and 2 objections. Counsel's office attempted to contact each of the opt-outs and the lone objector to understand the reasons for their respective decisions as well as to offer any assistance in clarifying the class documents. *Id*. The results of Counsel's calls are as follows:

(a)   <u>No Telephone – one person</u>

Briene Christopher Blake had no telephone listed, and no number could be located.

(b)    <u>Misunderstanding</u> – one person[2]

Luis Manuel Garcia Villalobos was afraid that the claim form was some sort of trap and that, at some point in the future, someone would be demanding the money be returned. All reassurances to the contrary did not put his fears to rest, but he did agree to think it over and contact counsel's office if he changed his mind or had further questions.

(c)    <u>Not Class Members – five people</u>

Arcilia Louise Carter, Glen E. Moore, Carissa Fernandez and Jason Herrera communicated that they believed they did not qualify as class members under the descriptions of the classes in the class notice. They either did not recall being strip searched, or recall the circumstances of their searches differently than what was described in the class notice. Domitilo Acevedo stated that he had never been in jail in Kern County and that perhaps it was a case of mistaken identity. These individuals did not qualify as class members. Accordingly, they are not "opt outs" as defined by the Settlement Agreement. *See* Settlement Agreement, ¶ 8 (defining opt-out as a member of the settlement class who files an opt-out notice) and ¶¶10, 11, 12, 13 (defining class members) [Docket No. 125.2, pp.17, 18]; *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 617 (1997) ("alert *class members* to their right to "opt out" of a (b)(3) class) (emphasis supplied); *Staton v. Boeing Co.*, 327 F.3d 938, 948 (9th Cir. 2003) (settlement agreement "allows members of that class to opt out of the monetary relief provisions").

(d)    <u>Objection– two persons</u>

One objection came from Gregory McClellan, an inmate at Lerdo Jail Facility, who indicated in his objection that he believed he would receive $200 and objected that this amount was not sufficient. He believes he should receive $1,500, and that the case should go to trial. Plaintiffs' counsel represents that he could not be reached by phone due to his incarceration.

---

[2] This count does not include one class member who, after the circumstances were explained, decided to withdraw the opt-out and file a claim form.

A second objection came from Sean Robbins, who receives $200 under the settlement. He objects to the amount he is to receive and also claims that he was strip searched by female officers.

The merits of the objections are addressed in the Final Approval Order.

## III.  THE AMOUNT REQUESTED BY PLAINTIFFS' COUNSEL IS REASONABLE AS A PERCENTAGE OF THE CLASS FUND

In this case, Plaintiffs' counsel seek an award of $2 Million, plus costs. Costs are relatively modest, totaling under $65,000, which includes all the specialized data work performed by consultants retained by Plaintiffs.

It is well established in the Ninth Circuit that, while the Court has discretion to use either a percentage of the fund or a lodestar approach in compensating class counsel (*see, e.g., Paul,* 886 F.2d at 272; *In re Washington Public Power Supply System Securities Litigation*, 19 F.3d at 1295), the percentage of the fund is the typical method of calculating class fund fees. *E.g., Vizcaino,* 290 F.3d at 1050 ("the primary basis of the fee award remains the percentage method"). While most circuits leave the method used to the discretion of the trial court, "[m]ost federal courts use the percentage of the fund approach in awarding attorneys' fees in common fund classes." *In re Enron Corp. Securities, Derivative & ERISA Litigation*, 586 F.Supp.2d 732, 748 (S.D.Tex. 2008).

### A.  *PERCENTAGE OF THE FUND METHOD OF CALCULATING FEES IN CLAIMS MADE SETTLEMENTS.*

Where there is a claims-made settlement, such as here, the percentage of the fund approach in the Ninth Circuit is based on the total money available to class members, plus costs (including class administrative costs) and fees. It is well established that, in claims made or class reversion cases where there is a maximum fund, and unclaimed funds revert to the defendant, it is appropriate to award class fund attorneys' fees based on the gross settlement fund. *See* Herbert B. Newberg and Alba Conte, *Newberg on Class Actions* §14.6 (4th Ed. 2007 update) ("[i]n *Boeing Co. v. Van Gemert*, 444 U.S. 156, 100 S. Ct. 745 (1980), the Supreme Court settled this question of whether class fund fees are based on the gross settlement or net settlement funds actually claimed by ruling that class

counsel are entitled to a reasonable fee based on the funds potentially available to be claimed, regardless of the amount actually claimed"); *Williams v. MGM-Pathe Commun. Co.,* 129 F.3d 1026 (9th Cir.1997) (reversing award of attorney's fees because trial court failed to base fee award on the entire settlement, rather than the amount claimed); *Waters v. Int'l Precious Metals Corp.,* 190 F.3d 1291, 1295 (11th Cir.1999) (distribution of attorneys' fees are to be based upon the funds available to eligible claimants, whether claimed or not; affirming a fee award nearly twice the amount actually claimed by the class from the fund); *Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423, 437 (2dCir. 2007) (the "entire Fund… is created through the efforts of counsel at the instigation of the entire class"; an "allocation of fees by percentage should therefore be awarded on the basis of the total funds made available, whether claimed or not").

Fees and class administration costs are included in determining the size of the fund. *See, e.g., Staton v. Boeing Co.*, 327 F.3d 938, 966 (9th Cir. 2003) ("constructing a hypothetical 'fund' by adding together the amount of money Boeing would pay in damages, the amount of fees provided to various counsel, the cost of the class action notices paid for by Boeing, and a gross amount of money ascribed to all the injunctive relief contained in the agreement"; court accepted the concept but not its application under the specifics there); *Johnston v. Comerica Mortg. Corp.*, 83 F.3d 241, 245-46 (8th Cir. 1996) (although "technically" defendant would pay fees directly rather than "out of the class' recovery… in essence the entire settlement amount comes from the same source"; even if "the fees are paid directly", they "are still best viewed as an aspect of the class' recovery", and, "[a]ccordingly, the direct payment of attorney fees by defendants should not be a barrier to the use of the percentage of the benefit analysis"), citing *In re General Motors,* 55 F.3d 768, 821 (3d Cir. 1995) (the "rationale behind the percentage of recovery method also applies in situations where, although the parties claim that the fee and settlement are independent, they actually come from the same source"); *In re Cendant Corp. PRIDES Litigation*, 243 F.3d 722, 734 (3d Cir. 2001) ("[t]hough this is not a traditional common-fund case, because the unclaimed portion of the settlement fund

is returned to Cendant and because the plaintiffs who recover may not be affected by the attorneys' fee award (depending on the number of plaintiffs who recover rights from the fund), use of the percentage-of-recovery method is appropriate in this case"); *In re: Vitamins Antitrust Litigation*, 2001 WL 34312839, *6 (D.D.C.) ("it is appropriate to treat this case as a constructive common fund despite the fact that the fees in the instant action are to be paid by defendants"; total value of constructive fund for percentage of fee purposes determined by adding the value of the fund exclusive of fees to be paid separately by defendants plus maximum amount of attorney's fees to be paid).

In this case, a maximum amount for each class was agreed to by capping the claims at 28% for each class. In addition, a maximum amount for Class Administration, attorneys' fees, attorneys' costs, and Class Representative awards was set. The table below presents these maximums to determine the gross fund against which the percentage of the fee is based as provided by the case authority discussed above.

| PERCENTAGE OF FUND | | |
|---|---|---|
| TOPIC | PERCENTAGE | AMOUNT |
| Post-Release Class Members - Total | | $2,335,830 |
| Group Strip Search Class Members - Total | | $2,016,000 |
| Named Class Reps | | $90,000 |
| Class Administration | | $500,000[3] |
| Attorneys' Fees | | $2,000,000 |
| Costs | | $65,000 |
| Total Putative Fund | | $7,006,830.00 |
| $2,000,000 Fee as % of Fund | 28.5435782% | |

While the Ninth Circuit has set a benchmark of 25% as a percentage of the fund, (*see Six Mexican Workers,* 904 F.2d at 1311 (establishing benchmark percentage of 25% of the fund as normal class counsel percentage of fund award)), this is an across the board

---

[3] The $500,000 figure is the amount up to which Defendants were obligated to pay for class administration without the ability to withdraw from the settlement. The final maximum bid was less than that amount, specifically $175,000. If that figure is used, the fee as a percentage of the total is 29.9319198 %.

benchmark, which is often adjusted upward or downward depending upon the assessment of the results, and the size of the fund. In megafund cases, fees more commonly will be under the 25% benchmark in this Circuit. *See* Appendix in *Vizcaino v. Microsoft Corp., supra*, 290 F3d 1043 (9th Cir. 2002) (providing fees in megafund cases between $50 Million - $100 Million). In contrast, in cases under $10 Million, the awards more frequently will exceed the 25% benchmark. *See Van Vranken v. Atlantic Richfield Co*., 901 F.Supp. 294, 297 (N.D. Cal. 1995) ("the cases…in which high percentages such as 30-50 percent of the fund were awarded involved relatively smaller funds of less than $10 million"). Even in the cases cited in the *Vizcaino* Appendix, which are all megafund cases where the recovery exceeds $50 Million, half the cases resulted in a fee of 25% or more (including *Vizcaino* itself, where the fee was 28% of a $97 Million fund, with a multiplier of 3.65).

The percentage figure here compares favorably with the general percentage of recovery awarded in cases around the country. *See* Silber and Goodrich, *Common Funds and Common Problems: Fee Objections and Class Counsel's Response*, 17 RevLitig 525, 534 (1998) (summarizing available data and recommending that a 33% of the fund fee award is both reasonable, and in line with the general market for contingent fee work); *In re Rite Aid Corp. Securities Litigation*, 396 F.3d at 303, citing three studies ("[O]ne study of securities class action settlements over $10 million ... found an average percentage fee recovery of 31%; a second study by the Federal Judicial Center of all class actions resolved or settled over a four-year period ... found a median percentage recovery range of 27-30%; and a third study of class action settlements between $100 million and $200 million ... found recoveries in the 25-30% range were 'fairly standard.'") (citations omitted).

A useful comparison is the decision in *Bynum v. District of Columbia*, 412 F. Supp.2d 73 (D.D.C. 2006), awarding a fee of 1/3 of a $12 Million fund[4], plus costs. Mr. Litt was counsel in that case, which settled both over-detentions and post-release strip searches in the District of Columbia.

In making the award, Judge Lamberth observed that:

❖ The plaintiffs "engaged in protracted efforts over a period of four years to obtain this settlement, which the court considers to be an outstanding settlement both in its monetary and in its non-monetary terms," leading to an "exceptional" result.

❖ The litigation was "complex…, involving novel issues, and the effort that went into the results reflects that fact."

❖ "Extraordinary effort went into the resolution of these cases, not only through litigation, but through many hours of mediation."

❖ The issues were "hotly contested."

❖ "The outcome of this case was unclear and subject to serious risk of lack of success at the time the cases were filed and during the course of the litigation. The court is aware that cases of this nature are extremely risky and burdensome for plaintiffs' counsel."

❖ "Class counsel did an outstanding job and obtained exceptional results for the class."

❖ [S]ubstantial benefits were conferred on the class beyond the monetary recovery for the class, in the form of the significant policy changes in the operation of the Department of Corrections that resulted from this litigation. This is a substantial factor in the court's determination of the appropriate fee."

---

[4] $3 Million of the fund was not for the direct benefit of individual class members, but rather was an amount that the jail had to spend to improve its inmate processing.

❖ "The attorneys involved in this litigation on behalf of the class are
experienced and capable civil rights attorneys."

A lodestar cross-check is not required in this circuit, and in a case such as this, is
not a useful reference point. *See, e.g., Glass v. UBS Financial Services, Inc*., 2007 WL
221862, 16 (N.D. Cal. 2007). In *Glass*, no lodestar cross-check was required by the court
where an early settlement resulted in exceptional results for the class even though some
class members and the New York attorney general objected to the 25% of the fund
request as excessive. As of the time of this writing, counsel in this case has received only
two objections to the settlement, and those objections were not to the amount of
attorneys' fees. The objections were to the amount of the particular class members'
compensation. *Id*. The *Glass* Court awarded fees of $11,250,000 despite the fact that, as
here, the $45 Million fund was subject to a reversion for unclaimed funds so that the
actual fund could end up being substantially less than the theoretical fund.

## IV.   FAILING TO AWARD THE FEES AND COSTS REQUESTED WOULD FRUSTRATE THE PURPOSES OF CLASS ACTIONS IN THE CONTEXT OF THIS SETTLEMENT.

Because of the structure of the settlement agreement, the $2,000,000 allocated to
fees is separate from the individual class members' recovery, i.e., class members will not
receive more if a lower fee is awarded. It is well established that one important purpose
of the class action device is that defendants should not benefit from their wrongdoing,
and should be deterred from doing so by being vulnerable to class actions to remedy their
wrongful conduct. *See, e.g.*, Richard A. Posner, *Economic Analysis of Law* 626-27 (5th
ed. 1998) ("the most important point from an economic standpoint is that the violator be
confronted with the costs of his violation-this achieves the allocative purpose of the suit-
not that he pays them to his victims"); John C. Coffee, Jr., *Reforming the Securities Class
Action: An Essay on Deterrence and Its Implementation,* 2-3 (Columbia Law. Sch. Ctr.
for Law & Econ. Studies, Working Paper No. 293, 2006) (available at http://ssrn.com/
abstract_id =893833 ("[d]eterrence... is the only rationale that can justify the significant
costs--both public and private--that securities class actions impose on both investors and

the judiciary"). Where, as here, the class members are receiving a substantial monetary recovery, and the interests of the class members and counsel are aligned, i.e., class counsel is not receiving an unreasonable proportion of the total recovery, this is an appropriate consideration.

Through the deterrence prism, Defendants would receive an unjustified windfall if the requested fees were not granted in full. In addition, it is critically important to provide appropriate incentives for attorneys to undertake the risk of class litigation. To the extent they are not properly awarded when they are successful, that undermines the deterrent purpose of the class action mechanism. As recent commentators have observed, if the economic interests of the class and counsel are misaligned, class counsel lose the incentive to maximize the benefit to the class because they do not participate, or do not fully participate, in the benefit of a larger recovery. *See, e.g*., Myriam Gilles, *Exploding The Class Action Agency Costs Myth: The Social Utility Of Entrepreneurial Lawyers*, University of Pennsylvania Law Review, 155 U. Pa. L. Rev. 103 (November 2006).

## V.    CONCLUSION

This Court finds that Plaintiffs' counsel obtained an excellent result in a complex and risky case. The size of the fund is large but not in the mega-fund category. The damages class numbers approximately 36,000, over 7500 claims were filed, and tens of thousands of future inmates have benefited from the policy changes brought about by this suit. The widespread pecuniary and non-pecuniary benefit created supports an attorneys' fee award which provides counsel with an incentive for undertaking future complex and risky litigation. The Court recognizes the skill and experience brought to bear by class counsel throughout the approximately three years they spent litigating and settling this case, and the economy with which they were able to achieve a noteworthy settlement. Having also considered the time invested in this case by counsel, and the awards in comparable cases, the Court finds that 28.5% percent of the Settlement Fund (or 29.9% if the actual rather than the agreed upon class administration costs are used) results in a fair and reasonable award of attorneys' fees and costs in this action. The Court further finds that this award is justified by the high caliber of Plaintiffs' counsels' work in this case.

Class counsel are awarded an attorneys' fee of $2,000,000, plus $44,393.60 in costs.

IT IS SO ORDERED.

Dated:   __**September 1, 2011**__          _____ /s/ *Dennis L. Beck*
                                         UNITED STATES MAGISTRATE JUDGE